**XCO PRODUCTION COMPANY,**
Appellant,

v.

**Bruce L. JAMISON and B.L. Jamison Family Limited Partnership,**
Appellees.

No. 14–03–01198–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

April 28, 2006.

Harvey F. Cohen, Austin, Roger D. Townsend, Houston, for appellant.

Bruce L. Jamison, Edward J. Hennessy, Houston, for appellees.

Panel consists of Chief Justice HEDGES and Justices EDELMAN and GUZMAN.

### SUBSTITUTE OPINION

EVA M. GUZMAN, Justice.

We overrule the Motion for Rehearing filed by Appellant. We withdraw the opinion issued on May 26, 2005, and we issue the following substitute opinion in its place.

Appellees, Bruce L. Jamison and B.L. Jamison Family Limited Partnership (collectively "Jamison"), sued appellant XCO Production Company ("XCO") for breach of a contract governing Jamison's purchase of an interest in certain oil and gas properties. The parties disagree over the interpretation of the contract. After a jury returned its verdict interpreting the contract in Jamison's favor, the trial court entered judgment for Jamison.

In three issues, XCO contends (1) the trial court erred by submitting a jury question regarding interpretation of the contract because it is unambiguous and in XCO's favor as a matter of law, (2) Jamison's claim is barred by the four-year statute of limitations, and (3) Jamison's claim is barred by a two-year contractual limitations period. We agree that the contract is unambiguous as a matter of law, but in Jamison's favor. Therefore, we conclude any error in submitting the jury question was harmless. We further conclude XCO failed to prove that Jamison's breach of contract claim is barred by the four-year

statute of limitations or a contractual limitations period. Accordingly, we affirm.

### I. BACKGROUND

XCO is an oil and gas exploration company owned by Robert Gray. The company owned working interests in oil and gas properties in Louisiana. Southampton Mineral Corporation was the operator for these properties. In 1991, Jamison, who was interested in a low-risk investment opportunity that would provide tax advantages and future income, was introduced to Gray by one of Jamison's friends.

Jamison and XCO entered into a written "Memorandum of Agreement" ("Partnership Agreement") effective December 13, 1991, whereby Jamison purchased a portion of XCO's working interest in several Louisiana properties. The Partnership Agreement created a tax partnership ("Partnership") between Jamison and XCO.[1] Under the Partnership Agreement, Jamison made a $500,000.00 capital contribution to the partnership, and XCO contributed its working interest in the properties. The disputed portion of the Partnership Agreement, paragraph 9, concerns allocation of income and costs between XCO and Jamison:

> 9. Partnership Allocations. Each item of income, gain, loss or deduction shall be allocated between XCO and JAMISON as follows:
>
> (a) First, all [intangible drilling costs] and general and administrative costs paid from December 13, 1991 through December 31, 1992, shall be allocated to JAMISON, provided, however, that no such amounts shall be allocated to Jamison which would cause his fair market value capital

---

1. XCO and Jamison were considered partners for federal income taxation purposes only. They were not considered partners with respect to liabilities and obligations under state

law. Jamison's tax attorney testified that the federal government permits this type of arrangement to stimulate oil and gas investment.

account to become negative or increase its negative position;

(b) Second, all depreciation with respect to tangibles held by the Tax Partnership or with respect to the Weldon Operating Agreement and allocable to the XCO–JAMISON partnership shall be allocated to JAMISON, provided, however, that such allocations, in the aggregate, shall not cause his fair market value capital account to become negative or increase its negative position;

(c) All costs other than those set forth in paragraphs 9.a and 9.b of this Memorandum of Agreement shall be allocated to XCO;

(d) 30% of the XCO–JAMISON Partnership's net revenues, after adjustment for the items of cost set forth in paragraphs 9.a, b and c of this Memorandum of Agreement, shall be allocated to JAMISON until such time as he has received $500,000.00 in distributions from the XCO–JAMISON Partnership ("Payout"); the balance of the net revenues shall be allocated to XCO *during* such period.

(e) After Payout, Jamison shall receive 1.25% of the net profits of the XCO–Jamison Partnership; the balance of the XCO–JAMISON Partnership's revenues, and all of its expenses, shall be allocated after Payout to XCO.

The parties urge different interpretations of paragraph 9. In summary, XCO claims paragraph 9 allowed XCO to deduct *all* costs, including lease operating expenses, intangible drilling costs, general and administrative costs, and depreciation, from net revenues to determine Jamison's Payout (30% of net revenues). In contrast, Jamison claims XCO could allocate to him only the costs listed in subpara-

graphs (a) and (b) (intangible drilling costs, general and administrative costs, and depreciation); and once $500,000.00 in costs were allocated to him, he was entitled to 30% of net revenues, without regard to costs, until he recouped his initial $500,000.00 investment.

Beginning in 1992, Southampton issued revenue and expense statements to the XCO–Jamison Partnership. The statements showed the gross income, taxes, royalties, and operating expenses of the various properties, and the net profit or loss allocable to the aggregated working interests that partnered with Southampton in the properties. The statements did not directly show the amounts to be billed or credited to the XCO–Jamison Partnership, but instead listed the amounts of "Net to XCO" and "Jamison Net Profit." "Net revenues" to Jamison, as addressed by paragraph 9(d) of the Partnership Agreement, were not addressed by these statements; however, the statements did reflect that Southampton deducted expenses from "Jamison Net Profit" which were not included in paragraphs 9(a) or 9(b) of the Partnership Agreement.

In mid–1992, an unrelated lawsuit involving the properties was filed against XCO in Louisiana. The Louisiana court ordered that all XCO's revenues be paid into the registry of the Louisiana court. The revenues were not released until early 1996. At that time, XCO told Jamison he would receive no money because costs had greatly exceeded revenues.

In 1999, Jamison sued XCO for breach of contract alleging that XCO failed to pay monies due and improperly charged costs to him. Jamison also alleged the Partnership Agreement was ambiguous. After hearing the evidence, the trial court determined that the Partnership Agreement was *ambiguous and submitted a jury* question regarding its meaning. Specifically,

the jury was asked, "Did [XCO] and [Jamison] agree that [Jamison] would be paid 30% of net revenues after Jamison's $500,-000[.00] investment was expended only on costs allocated to Jamison in Paragraph 9(a) and 9(b) of the parties' [Partnership] Agreement?" The jury answered "yes," thus interpreting the Partnership Agreement in Jamison's favor. The trial court entered judgment awarding Jamison $417,173.00 in actual damages and $111,500.00 in attorneys' fees, as well as pre-judgment and post-judgment interest.

## II.  INTERPRETATION OF THE PARTNERSHIP AGREEMENT

█  In its first issue, XCO contends the trial court erred in submitting the jury question regarding interpretation of the Partnership Agreement because the contract is unambiguous in XCO's favor as a matter of law.[2]

### A.  CONSTRUCTION OF CONTRACTS

█  Our primary concern in interpreting a contract is ascertaining the true intent of the parties. *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996); *Hewlett–Packard Co. v. Benchmark Elecs., Inc.*, 142 S.W.3d 554, 561 (Tex.App.-Houston [14th Dist.] 2004, pet. denied). We examine the writing as a whole in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983); *Hewlett–Packard*, 142 S.W.3d at 561. We presume that the parties to a contract intend every clause to have some effect. *Heritage Res.*, 939 S.W.2d at 121. We give terms their plain, ordinary, and generally accepted meaning unless the con-

tract shows the parties used them in a technical or different sense. *Id.*

█  A contract is not ambiguous if it can be given a certain or definite meaning as a matter of law. *Universal Health Servs., Inc. v. Renaissance Women's Group, P.A.*, 121 S.W.3d 742, 746 (Tex. 2003); *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex.1996). Lack of clarity does not create an ambiguity. *Universal Health Servs.*, 121 S.W.3d at 746; *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 134 (Tex.1994). Further, a contract is not ambiguous simply because the parties advance conflicting interpretations. *Columbia Gas Transmission Corp.*, 940 S.W.2d at 589; *Forbau*, 876 S.W.2d at 134. Rather, a contract is ambiguous if it is subject to two or more reasonable interpretations after applying the pertinent rules of construction. *Universal Health Servs.*, 121 S.W.3d at 746; *Columbia Gas Transmission Corp.*, 940 S.W.2d at 589. If a contract is ambiguous, a fact issue exists on the parties' intent. *Columbia Gas Transmission Corp.*, 940 S.W.2d at 589.

█  In determining whether a contract is ambiguous, we look to the contract as a whole, in light of the circumstances present when the contract was executed. *Sun Oil Co. (Del.) v. Madeley*, 626 S.W.2d 726, 731 (Tex.1981); *Mescalero Energy, Inc. v. Underwriters Indem. Gen. Agency, Inc.*, 56 S.W.3d 313, 319 (Tex.App.-Houston [1st Dist.] 2001, pet. denied); *see also Hewlett–Packard*, 142 S.W.3d at 561 ("We construe a contract from a utilitarian standpoint, bearing in mind the particular business activity sought to be served."). These circumstances include the commonly understood meaning in the industry of a

---

2.  In its brief, XCO frames its first issue in several different ways. However, the theme of its complaint is that the trial court erred in submitting the jury question because the Part-

nership Agreement is unambiguous as a matter of law. XCO does not challenge the sufficiency of the evidence supporting the jury's finding.

specialized term, which may be proven by extrinsic evidence such as expert testimony or reference material. *See Mescalero,* 56 S.W.3d at 320, 323; *Zurich Am. Ins. Co. v. Hunt Petroleum (AEC), Inc.* 157 S.W.3d 462, 465 (Tex.App.-Houston [14th Dist.] 2004, no pet.).

Accordingly, to determine whether the Partnership Agreement is ambiguous, we first examine the words of the Partnership Agreement, and considering the business activity to be served, determine the meaning of any specialized term as it is interpreted in the industry. We then must decide whether both parties' interpretations are reasonable. If only one reasonable interpretation is offered, we will not find the Partnership Agreement ambiguous, but will enforce the Partnership Agreement according to its terms. After examining the Partnership Agreement and the circumstances present when it was made, we conclude that XCO's construction is *not* reasonable, but Jamison's interpretation *is* reasonable.

**B. XCO's Interpretation**

In support of its argument that only its interpretation is reasonable, XCO points to subparagraph 9(d) which provides, "30% of the XCO–JAMISON Partnership's net revenues, *after adjustment for the items of cost set forth in paragraphs 9.a, b and c* . . . shall be allocated to JAMISON . . . ." (emphasis added). According to XCO, "after adjustment" means "subtract"; thus, *all* costs, including the costs set forth in subparagraphs (a), (b), and (c), are to be subtracted from net revenues before determining Jamison's 30% Payout.[3]

XCO states that because Jamison purchased a "working interest" in the properties and a "working interest" is a cost-bearing interest, all costs had to be deducted from net revenues for Jamison's interest to be a "working interest." The court-appointed auditor who examined the Agreement in connection with this suit opined in his report that all costs were to be deducted from net revenues to determine Jamison's Payout. This interpretation of subparagraph (d), however, creates several conflicts with the rest of paragraph 9. *See J.M. Davidson, Inc. v. Webster,* 128 S.W.3d 223, 229 (Tex.2003) (stating that in construing contracts, no single provision taken alone will be given controlling effect; rather, the court must consider the entire contract to harmonize and give effect to all its provisions, so that none will be rendered meaningless).

First, under XCO's interpretation, subparagraph (d) conflicts with subparagraphs (a) and (b). Subparagraphs (a) and (b) state that certain costs are to be allocated to Jamison's capital account. However, according to XCO, under subparagraph (d), these same costs are to be subtracted from net revenues to determine Jamison's Payout. Therefore, XCO's interpretation creates a conflict as to how the costs are to be treated.

Further, under XCO's interpretation, subparagraph (d) conflicts with subparagraph (c). Subparagraph (c) provides that all costs *other* than intangible drilling costs, general and administrative costs, and depreciation are to be allocated to XCO. But, subtracting these "other" costs from net revenues to calculate Jamison's Payout, as urged by XCO, would effective-

---

**3.** According to XCO, these costs include all lease operating expenses, in addition to intangible drilling costs, general and administrative costs, and depreciation. The lease operating expenses are at the center of this dispute. There is evidence that lease operat-

ing expenses are the primary type of other costs addressed in subparagraph (c). Further, XCO deducted large amounts of lease operating expenses from net revenues pursuant to its interpretation of the Partnership Agreement.

ly allocate a portion of these costs to Jamison in contravention of subparagraph (c).

In addition, under XCO's interpretation, there is no limit on the amount of costs that may be deducted from net revenues to determine Jamison's Payout. That reasoning, however, conflicts with subparagraphs (a) and (b) which provide that "no such amounts shall be allocated to Jamison that would cause his fair market value capital account to become negative or increase its negative position." Allocating all costs, regardless of amount, to Jamison could cause his capital account ($500,-000.00) to become negative.

Finally, XCO's interpretation does not reconcile the use of the term "net revenues" in subparagraph (d) with the use of the term "net profits" in subparagraph (e). According to XCO, under subparagraph (d), all costs are to be subtracted from "net revenues" to determine Jamison's Payout. However, under subparagraph (e), after Jamison's Payout reaches $500,000.00, he then receives 1.25% of "net profits." If "net revenues" include all costs as urged by XCO, then the use of the term "net profits" in subparagraph (e) is rendered meaningless; it would be merely synonymous with "net revenues." By using different terms, the parties recognized the difference between the two terms and manifested their intention to treat "net revenue" separately from "net profit." See Sun Oil Co., 626 S.W.2d at 728 (where parties used different terms for oil and gas in a lease, it was apparent the parties understood the difference and intended to treat them separately). XCO's interpretation fails to explain how Jamison's interest converts from a "net revenues" interest to a "net profits" interest if all costs are already being deducted from "net revenues."

Because XCO's interpretation creates several internal conflicts in paragraph 9, we conclude that XCO's interpretation is not reasonable.

## C. JAMISON'S INTERPRETATION

To substantiate his interpretation of paragraph 9, Jamison relies on the testimony of Shelly Cashion, his tax lawyer who drafted the Partnership Agreement.[4] Cashion testified the Partnership Agreement was an "odd duck" because it included accounting methodology unique to tax partnerships. According to Cashion, in oil and gas taxation, "allocate," "adjust," "net revenues," and "net profits" are terms of art. Cashion defined these terms as follows:

> "*Allocate*": means to divide tax items among partners.
>
> "*Adjust*": is the consequence of that "allocation." "Adjust" does not mean "subtract" or "deduct." Rather, tax

---

4. XCO contends that Cashion's testimony, as well as all evidence regarding the parties' intent, is inadmissible parol evidence. Extrinsic evidence is not admissible to create an ambiguity or vary the terms of an unambiguous agreement; however, when determining whether an agreement is ambiguous, we may examine extrinsic evidence to interpret the terms used by the parties and extrinsic evidence of the circumstances surrounding execution of the agreement. *See Balandran v. Safeco Inc. Co. of Am.*, 972 S.W.2d 738, 741 (Tex.1998); *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus., Inc.*, 907 S.W.2d 517, 521 (Tex.1995); *Sun Oil Co.*, 626 S.W.2d

at 731. Expert testimony may be particularly useful in explaining the "commonly understood meaning in the industry of a specialized term." *Mescalero*, 56 S.W.3d at 320, 323; *Zurich Am. Ins. Co.*, 157 S.W.3d at 465. Jamison offered the testimony of Ms. Cashion, as well as the testimony of its expert who reviewed the Partnership Agreement in connection with this suit for this purpose. XCO also offered the report of the court-appointed auditor, who agreed with XCO's interpretation. This evidence was not admitted to create an ambiguity or to vary the terms of the Partnership Agreement, but to explain its specialized terms.

items are "allocated" to a partner, and the partner's capital account is "adjusted" to account for that "allocation."

*"Net revenues"*: means the cash from oil and gas production minus severance taxes and royalties only.

*"Net profits"*: means "net revenues" minus "lease operating expenses," which are the operating costs of the business.

Applying these definitions to paragraph 9, Cashion explained that pursuant to subparagraphs (a) and (b), intangible drilling costs, general and administrative expenses, and depreciation are *allocated* to Jamison's capital account until his capital account reaches zero. In other words, Jamison receives a total allocation of no more than $500,000.00 in intangible drilling costs, general and administrative expenses, and depreciation. Pursuant to subparagraph (c), all other costs are allocated to XCO's capital account.

Next, Cashion explained the operation of the disputed subparagraph (d). She testified that the phrase "after adjustment for the items of cost set forth in paragraphs 9(a), (b), and (c)" does not require that all the costs outlined in subparagraphs (a), (b), and (c) be subtracted from net revenues to determine Jamison's Payout. Rather, the phrase is a "timing mecha-

nism." After these costs are allocated to the respective capital accounts pursuant to subparagraphs (a), (b), and (c) and Jamison's capital account reaches zero, Jamison receives 30% of net revenues until he recoups his $500,000.00 capital contribution. Thus, Jamison does not receive a percentage of net revenues until his capital account is exhausted. Further, because the term "net revenues" is used, Jamison receives 30% of net revenues without regard to costs, including lease operating expenses. In sum, the Partnership spends Jamison's $500,000.00, then pays Jamison a percentage of net revenues until Jamison's initial $500,000.00 is repaid in full.

Cashion then stated that pursuant to subparagraph (e), once Jamison recoups his $500,000.00, his interest would convert to receiving 1.25% of "net profits," which means he is then charged with a proportionate share of *all* costs, including lease operating expenses.

We conclude Cashion's explanation of paragraph 9 is reasonable because, inter alia, her definitions of "allocate" and "adjustment" resolve any conflicts between the subparagraphs. Further, Cashion's distinction between "net revenues" and "net profits" explains the parties' decision to use the term "net revenues" in subparagraph (d), and "net profits" in subparagraph (e).[5] It is also consistent with the

**5.** XCO has not offered a contrary definition for the terms used in the Partnership Agreement that is reasonable. In his report, the court-appointed auditor stated that a "net revenues" interest is substantially the same as a "net profits" interest for purposes of this Partnership Agreement. This fails to explain the use of the two different terms in subparagraphs (d) and (e). Further, the auditor stated that his audit was based on Council of Petroleum Accounting Societies (COPAS) principles. Jamison's expert testified that COPAS explicitly defines "net revenues" as gross proceeds less royalties and severance taxes; and COPAS explicitly defines "net

profits" as gross proceeds less royalties, severance taxes, *and* operating expenses. In fact, later in his report, the auditor seems to acknowledge that the terms are not the same. In particular, the auditor later summarizes the partnership's revenues, costs, and Jamison's interest. The auditor has two separate categories entitled: "Net Revenues allocated to Jamison (per paragraph 9d of the [Partnership Agreement])" and "Net Profit Interest (per paragraph 9e of the [Partnership Agreement])." With respect to the latter category, the auditor notes that the net profit interest "[i]s not applicable until such time that the

way in which tax partnerships use those terms, and with Gray's own use of the terms in negotiating the Partnership Agreement.

Jamison's interpretation is also consistent with the circumstances existing when the contract was executed and the "particular business activity" to be served. *See Hewlett–Packard*, 142 S.W.3d at 561 ("We construe a contract from a utilitarian standpoint, bearing in mind the particular business activity sought to be served"). It is undisputed that, from the outset of their relationship, Jamison consistently represented to Gray that he wanted a low-risk investment with maximum tax advantages and an opportunity to get his capital back. In return, Jamison was willing to receive only a small percentage of the net profits over the long term. If the parties had agreed that revenues could be reduced by all potential costs before calculating Jamison's Payout, as urged by XCO, Jamison's investment would not have been low-risk.

The most significant evidence of the circumstances present when the contract was made is a letter from Gray to Jamison outlining XCO's proposal. Gray stated that XCO anticipated incurring a certain amount of general and administrative costs and intangible drilling costs in a short time period with respect to the properties. Gray proposed that Jamison "reimburse" XCO for these costs. Gray also proposed that Jamison

> would receive a defined percentage of XCO's monthly production *revenues* on

Net Revenue distribution reaches $500,-000[.00]."

*a preferential basis computed without regard to expense.* After [Jamison] had recouped the value of his investment, his interest in the partnership would *convert to a 'net profits interest'* such that he would receive a significantly reduced percentage of the net profits attributable to the partnership.

(emphasis added).[6] This proposal is consistent with Jamison's argument that only certain costs were to be allocated to him; then, he would recoup his investment out of net revenues without regard to operating costs before his interest converted to a net profits interest.[7]

Nevertheless, Gray testified that the portion of his proposal offering to return Jamison's investment "on a preferential basis computed without regard to expense" was not embodied in the final Partnership Agreement. According to Gray, Cashion and XCO's tax lawyer advised him that his proposal could not be utilized because it created, in effect, a cost-less interest that would not allow Jamison any tax deductions.

At trial, however, Cashion explained her concerns with the initial proposal. She stated that Gray's proposal would result in Jamison's immediately recouping his investment out of net revenues. Cashion feared the IRS might view such an arrangement as a loan, rather than an investment, and thus disallow any deductions. Therefore, she and XCO's tax attorney decided to draft the Partnership

return is 30% of net revenues without regard to expenses.

6. Gray attached a pro forma projecting production from the properties on a monthly basis and Jamison's corresponding potential return on his investment. Gray proposed two alternatives based on Jamison's contribution of $500,000.00 or $1 million. The pro forma shows Jamison's potential return under both scenarios. Under both scenarios, Jamison's

7. Craig Crawford, Jamison's friend who introduced him to Gray, testified that Gray outlined a general proposal during their initial meetings. Gray represented that Jamison would be given "preferential treatment" on the "front end" until he recouped $500,000.00; Jamison would then receive a smaller residual interest on the "tail end."

Agreement so as to postpone Jamison's participation in net revenues until his investment had been exhausted through allocation of the costs outlined in subparagraphs (a) and (b).[8]   Therefore, Gray's proposal that Jamison recoup his investment on a "on a preferential basis computed without regard to expense" *was* embodied in the final Partnership Agreement.   However, Cashion's tax concerns were alleviated by modifying the timing for Jamison to recoup his investment.[9]

■   In sum, Jamison's interpretation is reasonable because it reconciles the subparagraphs of paragraph 9 and is consistent with the circumstances present when the Partnership Agreement was made and the particular business activity to be served.   Because the Partnership Agreement is subject to only one reasonable interpretation, it is unambiguous as a matter of law.   *See Universal Health Servs., Inc.,* 121 S.W.3d at 746; *Columbia Gas Transmission Corp.,* 940 S.W.2d at 589.   Therefore, the trial court erred in submitting a jury question regarding interpretation of the Partnership Agreement.   *See Transcon. Gas Pipeline Corp. v. Texaco, Inc.,* 35 S.W.3d 658, 665 (Tex.App.-Houston [1st Dist.] 2000, pet. denied) (stating that a trial court errs when it does not construe an unambiguous provision as a matter of law, and instead, submits the issue to a fact finder).   However, the error is harmless because the jury interpreted the Partnership Agreement in Jamison's favor.   *See* TEX.R.APP. P. 44.1(a)(1); *see also Med. Towers, Ltd. v. St. Luke's Episcopal Hosp.,* 750 S.W.2d 820, 826 (Tex. App.-Houston [14th Dist.] 1988, writ denied) (absent a showing of some prejudice,

submission of a question of law to the jury is harmless since the trial court can always use the jury's findings as advisory only).   Accordingly, we overrule XCO's first issue.

### III.   FOUR-YEAR STATUTE OF LIMITATIONS

In its second issue, XCO contends that Jamison's breach of contract claim was barred by the four-year statute of limitations as a matter of law.   *See* TEX. CIV. PRAC. & REM.CODE ANN. § 16.004 (Vernon 2002).

### A.   ACCRUAL OF THE CAUSE OF ACTION

■   A breach of contract occurs when a party fails or refuses to do something he has promised to do.   *Townewest Homeowners Ass'n, Inc. v. Warner Communication Inc.,* 826 S.W.2d 638, 640 (Tex. App.-Houston [14th Dist.] 1992, no writ).   The court determines what conduct is required by the parties, and, insofar as a dispute exists concerning the failure of a party to perform the contract, the court submits the disputed fact questions to the jury.   *Meek v. Bishop, Peterson & Sharp, P.C.,* 919 S.W.2d 805, 808 (Tex.App.-Houston [14th Dist.] 1996, writ denied).   Where reasonable minds may differ as to the inferences to be drawn from the evidence, it is incumbent upon the party asserting limitations to secure findings sustaining the plea of limitations.   *Intermedics, Inc. v. Grady,* 683 S.W.2d 842, 845 (Tex.App.-Houston [1st Dist.] 1984, writ ref'd n.r.e.).   The failure to request a jury instruction on an affirmative defense results in waiver of that ground by the party relying on it unless the issue was conclusively established.   *See* TEX.R. CIV. P. 279; *Abraxas Petroleum Corp. v. Hornburg,* 20 S.W.3d 741, 764 (Tex.App.-El Paso 2000, no pet.).

---

8.   XCO's tax attorney did not testify, and, thus, did not controvert Cashion's explanation.

9.   Cashion also testified regarding two other changes between the proposal and final Partnership Agreement, as well as a subsequent amendment.   However, these changes and amendment are not pertinent to this dispute.

When facts are undisputed or conclusively established, there is no need to submit those issues to the jury. *Sullivan v. Barnett,* 471 S.W.2d 39, 44 (Tex.1971); *Meek,* 919 S.W.2d at 808.

■■■ XCO contends that Jamison's claims are barred by the statute of limitations; therefore, the burden fell on XCO to plead and prove that the cause of action accrued more than four years before Jamison filed suit on July 30, 1999. *See Woods v. William M. Mercer, Inc.,* 769 S.W.2d 515, 517 (Tex.1988) (limitations is an affirmative defense, which the asserting party must prove); *Brown v. Zimmerman,* 160 S.W.3d 695, 702 (Tex.App.-Dallas 2005, no pet.) (the party asserting an affirmative defense has the burden of pleading and proving its elements). XCO argues that Jamison's cause of action accrued "when XCO allegedly breached the contract by deducting more than $500,000.00 in workover costs when calculating net revenue." XCO alleges that if a breach occurred, it occurred "when XCO sent Jamison the February and March 1993 [accounting] statements."

Jamison responds that these statements do not prove the breach of contract occurred in 1993 for several reasons, including (1) Jamison's receipt of erroneous accounting statements by Southampton does not constitute a breach of contract by XCO, particularly where XCO admits that the statements are erroneous; (2) XCO did not refuse to pay Jamison's share of net revenues in February 1993 because the revenues were frozen by a court, and therefore, XCO either had no "net revenue," or if it did, the distributions were not due and payable while they were sequestered by court order; (3) the time for performance was extended by XCO's reassurances that Southampton's statements were erroneous, and that the accounting would be corrected and funds distributed after the funds were released from the court; (4) XCO admits that the accounting statements contain errors; (5) Southampton's 1993 account statements could amount to no more than an anticipatory breach by XCO, and the statute of limitations begins to run on a promisor's breach/repudiation of a contract only if the repudiation is adopted by the non-repudiating party; and (6) even if a breach occurred in 1993, the statute of limitations was tolled while the funds were held in the registry of the court.

### 1. Southampton's Statements Are Not Attributable to XCO.

XCO is not only the appellant, but also bore the burden of proof to establish its limitations defense at trial; we therefore address its argument first.

XCO contends that to the extent it breached the contract, the breach occurred when XCO sent Jamison accounting statements in 1993 that allegedly demonstrated XCO's improper deduction of expenses from Jamison's account; but, Jamison correctly points out that the statements relied upon by XCO were actually issued by Southampton to the XCO–Jamison Partnership. XCO responds that Southampton's accounting statements to the Partnership constitute XCO's statements to Jamison because the Partnership Agreement states that Southampton is the Operator, and because XCO's president is also the president of Southampton. Additionally, XCO points out that Southampton's office address shown on the statements is the same as XCO's office address.

■■■ Texas law presumes that two separate corporations are distinct entities, and "a party seeking to ascribe one corporation's actions to another by disregarding their distinct corporate entities must prove this allegation." *BMC Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 798

(Tex.2002). Although XCO's arguments on appeal treat the two entities as one, none of the parties took the position in their pleadings or at trial that XCO and Southampton are constructively the same entity, nor was the jury asked to find that either company owned, controlled, or dominated the other.[10] The Partnership Agreement also treats XCO and Southampton as separate entities. Moreover, Southampton's statements to the Partnership do not purport to represent XCO's accounting of the intra-Partnership allocations required by the Partnership Agreement.[11] The statements bear no indication that they were prepared by XCO, make no mention of the Partnership Agreement, do not report on XCO and Jamison's capital accounts, and do not perform the calculations required by the Partnership Agreement.

We further note that a cause of action accrues and the statute of limitations begins to run when facts come into existence that authorize a party to seek a judicial remedy. *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.,* 962 S.W.2d 507, 514 (Tex.1998). Stated another way, a cause of action can generally be said to accrue when the wrongful act effects an injury, regardless of when the plaintiff learned of such injury. *Moreno v. Sterling Drug, Inc.,* 787 S.W.2d 348, 351 (Tex.1990). Even assuming that Jamison could have complained of errors in Southampton's statements, we are aware of no authority to support the proposition that Southampton's statements triggered Jamison's right to a judicial remedy *against XCO.* The statements were not prepared pursuant to or in accordance with the Partnership Agreement, and imply nothing regarding XCO's intent to abide by its terms. Moreover, XCO did not claim that Southampton's statements were correct; to the contrary, XCO admitted that the statements contained errors. XCO did not represent to Jamison that it would adopt the Southampton's accounting conclusions; to the contrary, XCO represented that it would correct the accounting statements and pay Jamison the net revenue due him when the funds were released from the Louisiana court. Finally, XCO has not shown that Southampton's erroneous statements injured Jamison. *See Southwell v. Univ. of the Incarnate Word,* 974 S.W.2d 351, 354–55 (Tex.App.-San Antonio 1998, pet. denied) (to prove an action for breach of contract, the plaintiff must establish the defendant's breach caused injury). Under these circumstances, Southampton's statements would not have supported a breach of contract claim by Jamison against XCO.

**10.** Robert Gray owns 100% of XCO and 50% of Southampton. Although Jamison alleged that Gray was the alter ego of XCO and Southampton, the allegation was denied by Gray, XCO, and Southampton.

**11.** For example, Southampton's February 1993 accounting statement lists the gross revenue, taxes, royalties and operating expenses associated with the various properties, and from these figures, calculates the "net to working interests." The statement then lists "net to XCO" and "Jamison net profit," though it is undisputed that Jamison had not received $500,000.00 in distributions at this time. In contrast, the Partnership Agreement requires the calculation of Jamison's net revenue—not net profit—until he receives $500,000.00 in distributions. Thus, Southampton's calculation of "Jamison net profit" is not the equivalent of XCO's required calculation of Jamison's net revenue. This particular statement also indicates that a "workover" expense of $869,700.00 for the St. Charles Church well was charged against the "net to working interests" and deducted in part from both "net to XCO" and "Jamison net profit." Southampton therefore lists "Jamison net profit" as a negative number, despite the fact that Jamison had not reached "Payout" and his interest had not yet converted from net revenue to net profit.

However, our analysis does not end here. Because the arguments and evidence adduced by Jamison offer independent grounds for affirmance, we address those as well.

### 2. XCO Did Not Refuse to Pay Net Revenue Before 1996.

Jamison contends that XCO's failure to pay Jamison in 1993–1995 was not the result of a breach of contract, but was instead caused by the Louisiana court's retention of the funds from 1992 until the early part of 1996. Specifically, Jamison claims that prior to 1996, XCO did not refuse to pay net revenues that were "due and payable" because (a) there was no refusal to pay, (b) there was no net revenue, and (c) if there was net revenue, it was not "due and payable" until released by the court.

XCO argues that Southampton's accounting statements should have alerted Jamison that XCO would not pay Jamison in accordance with the Partnership Agreement; however, both Jamison and Gray testified that the first time Gray or any of XCO's representatives ever told Jamison or any of Jamison's representatives that Jamison would not be paid was between January and March of 1996. According to Jamison, while the revenues were frozen, XCO reassured Jamison that he would receive his Payout when the revenues were released. Specifically, Jamison testified without contradiction that while the revenues were frozen, he asked Gray periodically about the status of the Louisiana suit. Gray responded that the suit was going well and said, "don't worry[,] your money is in there. Once we wrap this up, you're going to get your money. You are due your money, your net revenue." Jamison also testified that during 1992, he addressed with Gray whether his $500,000.00 investment was being properly allocated. Gray responded that XCO's accounting was a "mess," and "we really don't know whether it is expended or not expended or whatever, but it doesn't matter because you're ... going to get paid on this anyway because you're going to get your $500,000[.00]." Thus, the first "refusal to pay" occurred in 1996, fewer than four years before Jamison filed suit.

Moreover, the existence and extent of "net revenue" available to the Partnership is a question of fact that was not presented to the jury. Because XCO claimed Jamison's suit was time-barred, XCO bore the burden to obtain findings of fact necessary to support this affirmative defense. Having failed to do so, we cannot say that Jamison's cause of action accrued during a time when net revenues were not proven.[12]

---

12. Jamison additionally argues that, under the doctrine of impossibility, a party prevented by a government order from performing his contractual obligation is excused. *See Centex Corp. v. Dalton,* 840 S.W.2d 952, 954 (Tex.1992). Reasoning that it was impossible for XCO to distribute Jamison's net revenue while it was held in the registry of the court, Jamison argues that the statute of limitations should therefore be tolled as well. XCO responds that this proposition has never been part of the law of limitations. *But see Fed. Trust Co. v. Brand,* 76 S.W.2d 142, 144 (Tex. Civ.App.-Amarillo 1934, writ ref'd.) ("It is settled law in Texas and elsewhere, so far as we have been able to ascertain, that limitation does not run while property is in the custody of the law."); *see also Madeksho v. Abraham, Watkins, Nichols & Friend,* 112 S.W.3d 679, 688 (Tex.App.-Houston [14th Dist.] 2003, no pet.) (en banc) (per Brister, C.J., with three justices concurring and one justice concurring in result only) ("funds in the registry of the court are held in *custodia legis,* and thus exempt from claims by third parties. There is no point in requiring an earlier interpleader if *no one can file claims to the funds until after the mandate issues and the funds are released.*") (emphasis added). Because the existence and extent of "net revenue" due to Jamison were not determined at trial, we do not reach this issue.

In sum, we conclude XCO did not prove as a matter of law that Jamison's claim accrued more than four years before Jamison filed suit.[13]

## IV. CONTRACTUAL STATUTE OF LIMITATIONS

In its third issue, XCO contends that Jamison's breach of contract claim was also barred by a contractual time limitations clause. This argument was raised for the first time in XCO's motion for judgment notwithstanding the verdict. Although an answer filed jointly by XCO, Robert Gray, and Southampton asserts that "any claims for an accounting are restricted by the applicable limitations period of the Joint Operating Agreements attached to the [Partnership Agreement]," XCO did not assert that the agreements between Southampton and the non-operators barred Jamison's claim that XCO breached its Partnership Agreement with Jamison.

The Partnership Agreement gives Jamison a part of XCO's share in the Lake Boeuf Operating Agreement, the Weldon Operating Agreement, and the Lake Boeuf Tax Partnership (collectively, the "Operating Agreements"). The terms of each of these Operating Agreements, "except to the extent expressly inconsistent [with the Partnership Agreement]," are incorporated into the Partnership Agreement. The Operating Agreements incorporate the "Accounting Procedure and Joint Operations" agreement ("APJO Agreement") between Southampton, as the operator, and the non-operator parties to the Operating Agreements. The APJO Agreement addresses Southampton's statements and billings to non-operators, and provides in pertinent part:

[A]ll bills and statements rendered to Non–Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four month period a Non–Operator takes written exception thereto and makes claim on Operator for adjustment.

According to XCO, this provision imposed a two-year limitations period for Jamison to sue XCO regarding improper deductions from net revenues during a given year. We disagree.

This provision applies to accounting procedures between the operator and the non-operators. Southampton is the operator for these properties; XCO and other entities were the non-operators. Jamison purchased a portion of XCO's non-operator interest in the properties under a separate Partnership Agreement, and his dispute is with XCO over the terms of that Partnership Agreement. Jamison's dispute is not with Southampton. In short, this dispute is not between the operator and a non-operator. Rather, this dispute is between two partners who together constitute a single non-operator. Therefore, this provision does not impose a two-year contractual limitations period on Jamison with re-

---

**13.** XCO also asserts that the trial court erred by submitting a jury question that asked if, prior to July 30, 1995 (i.e., four years before suit), Jamison discovered or should have discovered facts causing him to believe he had a claim for breach of the Partnership Agreement. The jury answered, "no." Because XCO failed to prove that Jamison's cause of action accrued more than four years before suit, the discovery rule is inapplicable. However, submission of the jury question was harmless, because XCO did not establish that a breach of the Partnership Agreement occurred before July 30, 1995. *See also City of Brownsville v. Alvarado*, 897 S.W.2d 750, 752 (Tex.1995) ("Submission of an improper jury question can be harmless error if the jury's answers to other questions render the improper question immaterial.").

spect to his breach of contract claim against XCO.[14] We overrule XCO's third issue.

## V. Conclusion

In sum, we hold the Partnership Agreement is unambiguous as a matter of law, but in Jamison's favor. We further hold that XCO failed to prove that Jamison's breach of contract claim was barred by the four-year statute of limitations or a contractual limitations period. Accordingly, we affirm the judgment of the trial court.

---

14. On appeal, XCO contends for the first time that this limitations provision applies to accounting disputes between XCO and Jamison because Gray was an officer of both XCO and Southampton, Southampton issued Jamison's checks, and Southampton sent Jamison accounting statements from the same address as XCO. These facts do not change the terms of the Operating Agreements or the APJO Agreement. Those agreements state, and XCO admits, that Southampton is the operator. This limitations provision governs accounting between the operator and non-operator. It does not impose a limitations period on Jamison's suit against XCO.