**Opinion issued June 13, 2019**



In The

# Court of Appeals

For The

# First District of Texas

———————————————

## NO. 01-18-00044-CV

———————————————

**SAAHIR RAMJI AND BEACON BUILDERS INVESTMENT GROUP, INC.,**
**Appellants**

**V.**

**6100 CLARKSON, L.P., MATT STASSI, HERBERT B. RICHARDSON, MELVIN GRANT, MELVINE GUILFORD GRANT, AND REGINA PETERSON, EXECUTOR OF THE REGINA GRANT PETERSON TRUST,**
**Appellees**

**On Appeal from the 295th District Court**
**Harris County, Texas**
**Trial Court Case No. 2014-50460**

## MEMORANDUM OPINION

After being found liable by a jury for tortiously interfering with real estate

contracts by cutting out the "middleman" in a "pass-through" sale or "flip," making

negligent misrepresentations to the sellers regarding the transactions, and then

failing to comply with the resulting contract with the seller, appellants, Saahir Ramji and Beacon Builders Investment Group, Inc. (hereafter, "Ramji) bring this appeal raising five issues: (1) legal and factual sufficiency to support the tortious interference findings; (2) legal and factual sufficiency to support the breach-of-contract findings; (3) legal and factual sufficiency to support the negligent misrepresentation findings; (4) legal and factual sufficiency to support the jury's negative finding on an affirmative defense; and (5) trial court error in applying settlement credits. We affirm.

## BACKGROUND

In 2012, Matt Stassi located residential property on Clarkson Lane in Houston that he was interested in buying. The property was four separate tracts: 0 Clarkson Lane, owned by Melvin Grant; 6100 Clarkson Lane, owned by Lucretia Grant; 6102 Clarkson Lane, owned jointly by Melvin Grant and his sister, Melvina; and 6104 Clarkson Lane, owned by the Regina G. Peterson trust. Melvin Grant began negotiating with Stassi on behalf of his relatives. Though Stassi originally planned to develop the land himself, he, instead, decided to sell the property to another developer, Saahir Ramji, a real estate attorney and managing partner of Beacon Builders Investment Group, Inc., who owned the adjacent property. To that end,

2

Stassi, along with his business partner, Herbert B. Richardson, formed a limited partnership, 6100 Clarkson, L.P.,[1] to "flip" the property from the Grants to Ramji.

Thus, the "pass-through" sale or "flip" consisted of two sets of transactions. The "A-B contracts" between the Grants and Stassi, for a collective price of $650,000, were signed on June 10, 2014, and all but one was set to close on August 18, 2014.[2]

The "B-C contracts" between 6100 Clarkson (as Stassi's assignee) and Ramji, were also signed on June 10, 2014, for a collective price of "904,384.00, and were also set to close on August 18, 2014, at the same time as the "A-B contracts."

Before the August 18th closing, the parties became aware of an issue with the title to the tract owned by Lucretia Grant; the property was in the name of her late husband and his estate had not been probated. The parties to the "A-B Contracts" agreed to extend the closing until August 29th.[3]

---

[1]    For purposes of this opinion, Stassi, Richardson, and 6100 Clarkson, L.P. will be referred to collectively as "6100 Clarkson" unless referring to Stassi or Richardson, individually.

[2]    The sale from the Regina Grant Trust to Stassi was set to close on or before September 1, 2014.

[3]    Ramji claims that his obligations to purchase the properties from 6100 Clarkson pursuant to the "B-C contracts" nonetheless expired on August 18, 2014, because he and Stassi talked about, but never agreed to, proceed with the sale of three of the four properties for a reduced purchase price. 6100 Clarkson does not have a claim for breach of the "B-C contracts," thus whether the "B-C contracts" had expired is not an issue.

3

On August 27, 2014, Leslie Kuhn, an escrow agent at Alamo Title Company, advised the parties that Alamo Title would not close any deals with 6100 Clarkson because Stassi had a pending IRS lien. She nonetheless advised them that they were welcome to seek another title company to close the deals. Both Grant and Ramji testified that Kuhn told them that the Grants were "out of contract," although Kuhn did not recall doing so. Kuhn denied giving Grant's telephone number to Ramji, though there was evidence that she texted Ramji's phone number to Grant.

On that same day, August 27th, two days before the "A-B contracts" were set to close, Ramji called Grant to discuss the possibility of the Grants selling their property directly to Ramji, effectively cutting Stassi, the "middleman," out of the transactions. Grant testified that Ramji told him that Alamo Title "was not going to close our deal and the contracts were dead and we were free to sell to whoever we choose." Grant believed that he was under contract with Stassi until August 29th, but Ramji told him that he was not.

On either August 29th or August 30th, Ramji and Grant met at a Chick-fil-A restaurant to discuss a direct sale between the Grants and Ramji.[4] Ramji came to the meeting with a copy of the "A-B contract" and offered to pay the Grants the same price. Grant asked for more, so Ramji and Grant renegotiated the price of the three

---

[4] There is a dispute about the date of the Chick-fil-A meeting, which will be discussed in more detail later in the opinion.

lots that were then available so that the Grants would receive more than they would have gotten from Stassi and Ramji would pay less than he would have paid Stassi. Ramji also told Grant that he needed to send a letter to terminate the "A-B agreements," which Grant did on August 31, 2014.[5]

The contracts negotiated between the Grants and Ramji (hereafter, "the Chick-fil-A contracts") are dated August 29, 2014. Heidi Andrews, of Old Republic Title, the escrow agent for the Chick-fil-A contracts, testified that she receipted the contracts on August 29, 2014. Andrews testified that "we receipt a contract on the date it comes in to our office."

Unable to get in touch with either the Grants or Ramji about extending the closings beyond August 29th, Stassi filed a *lis pendens* on the properties. Ramji did not close the Chick-fil-A contracts with the Grants in light of the *lis pendens*.

6100 Clarkson and the Grants filed suit against Ramji for tortious interference with the "A-B contracts."[6] The Grants also brought claims against Ramji for breaching the Chick-fil-A contracts and negligent misrepresentation. After a jury trial, the jury returned a verdict against Ramji in favor of 6100 Clarkson and the Grants. Specifically, 6100 Clarkson was awarded $254,358 and the Grants were

---

[5] A termination letter by the Regina G. Peterson Trust was dated August 29, 2014.

[6] Initially, 6100 Clarkson also had claims against the Grants, but those claims were settled.

5

awarded $9,289.54 on their claims that Ramji tortiously interfered with the "A-B contracts"[7] The jury also found that Ramji had breached the Chick-fil-A contracts with the Grants and awarded them $130,500 cumulatively, plus attorney's fees and pre- and post-judgment interest. Though the jury also found in favor of the Grants on their negligent misrepresentation and tortious interference claims against Ramji, the Final Judgment does not include an award to the Grants based on these findings.

This appeal followed.

## SUFFICIENCY OF THE EVIDENCE

In issues one, three, and four, Ramji contends the evidence is legally and factually insufficient to support the jury's findings regarding his (1) tortious interference with the "A-B contracts" between the Grants and Stassi, (2) breach of the Chick-fil-A contracts between the Grants and Ramji, and (3) negligent misrepresentations to the Grants. We address each issue respectively.

### *Standard of Review*

When, as here, an appellant attacks the legal sufficiency of an adverse finding on an issue on which he did not have the burden of proof, he must demonstrate that no evidence supports the finding. *Examination Mgmt. Servs., Inc. v. Kersh Risk*

---

[7] The amount awarded to 6100 Clarkson in the Final Judgment was adjusted to reflect a settlement with Alamo Title for $170,000, leaving Ramji liable to 6100 Clarkson for $84,358.00. There is no award in the Final Judgment to the Clarks based on the tortious interference jury findings.

*Mgmt., Inc.*, 367 S.W.3d 835, 839 (Tex. App.—Dallas 2012, no pet.). We will sustain a legal sufficiency or "no-evidence" challenge if the record shows any one of the following: (1) a complete absence of evidence of a vital fact, (2) rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). In conducting a legal-sufficiency review, we consider the evidence in the light most favorable to the verdict and indulge every reasonable inference that supports it. *Id.* at 822. The term "inference" means,

> [i]n the law of evidence, a truth or proposition drawn from another which is supposed or admitted to be true. A process of reasoning by which a fact or proposition sought to be established is deduced as a logical consequence from other facts, or a state of facts, already proved.

*Marshall Field Stores, Inc. v. Gardiner*, 859 S.W.2d 391, 400 (Tex. App.—Houston [1st Dist.] 1993, writ dism'd w.o.j.) (internal quotations omitted). "For a jury to infer a fact, it must be able to deduce that fact as a logical consequence from other proven facts." *Id.*

If there is more than a scintilla of evidence to support the challenged finding, we must uphold it. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998). "[W]hen the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its

7

existence, the evidence is no more than a scintilla and, in legal effect, is no evidence." *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004) (internal quotations omitted). However, if the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then jurors must be allowed to do so. *City of Keller*, 168 S.W.3d at 822. "A reviewing court cannot substitute its judgment for that of the trier-of-fact, so long as the evidence falls within th[e] zone of reasonable disagreement." *Id.*

When an appellant attacks the factual sufficiency of an adverse finding on an issue on which he did not have the burden of proof, he must demonstrate that the adverse finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). In conducting a factual-sufficiency review, we examine, consider, and weigh all the evidence that supports or contradicts the fact finder's determination. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001); *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989). We note that the jury is the sole judge of the witnesses' credibility, and it may choose to believe one witness over another; a reviewing court may not impose its own opinion to the contrary. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). When presented with conflicting testimony, the fact finder may believe one witness and disbelieve others, and it may resolve inconsistencies in the testimony of any witness. *McGalliard v.*

8

*Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986). We set aside the verdict only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong or manifestly unjust. *See Dow Chem. Co.*, 46 S.W.3d at 242; *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986).

***Tortious Interference***

In issue one, Ramji contends there is legally and factually insufficient evidence to support the tortious interference findings. Specifically, Ramji argues that the "A-B contracts" between the Grants and Stassi had expired. In support of his position, Ramji argues that "6100 Clarkson's only witness on the issue (Melvin Grant, the seller of the real estate) testified that he intentionally waited for the contract with 6100 Clarkson to expire before he negotiated with [Ramji] to sell the Grant Properties." Ramji's position is that the Chick-fil-A contracts were negotiated and signed on August 30, 2014, the day *after* the "A-B contracts" did not close, and, as such, the Grants were no longer "under contract" with 6100 Clarkson. Ramji contends that "no reasonable jury could find that the contracts between Melvin Grant and [Ramji] were executed on Friday, August 29, (when the contracts between Grant and Stassi were ostensibly still valid and enforceable)," thus "no reasonable trier of fact could award damages to either 6100 Clarkson or the Grants for tortious interference."

9

*Legal Sufficiency*

As previously noted, because Ramji attacks the legal sufficiency of an adverse finding on an issue on which he did not have the burden of proof, he must demonstrate that no evidence supports the finding. *Examination Mgmt. Servs.*, 367 S.W.3d at 839. To determine whether a scintilla of evidence was presented, we consider the evidence in the light most favorable to the verdict. *City of Keller*, 168 S.W.3d at 822

The parties to the "A-B contracts"—Stassi, Richardson, and the Grants—all agree that the contracts had been extended until August 29th. The record shows that Ramji was aware through a series of emails from Leslie Kuhn at Alamo Title that the "A-B contracts" between the Grants and Stassi had been extended until August 29th.

Ramji himself testified, both at trial and in his prior deposition, that he met with Melvin Grant at the Chick-fil-A restaurant on August 29th. The contracts signed by Ramji and Grant at that meeting are dated August 29, 2014. Heidi Andrews, the escrow agent at Old Republic Title, testified that to "receipt" an earnest money contract "means that the contract is brought to you and you write down in a certain section of the contract that you've received the contract." When asked what Old Republic's policy was for dating receipted contracts, Andrews replied, "We

receipt a contract on the date that it comes into our office." The Chick-fil-A contracts were "receipted" by Old Republic on August 29, 2014.

This is more than a scintilla of evidence that the Chick-fil-A contracts were signed by Ramji and Grant on August 29, 2014, not August 30, 2014 as Ramji now claims.[8]

*Factual Sufficiency*

Because Ramji also attacks the factual sufficiency of an adverse finding on an issue on which he did not have the burden of proof, he must demonstrate that the adverse finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *Cain*, 709 S.W.2d at 176.

In support of his argument that the Chick-fil-A contracts were signed on August 30, 2014, Ramji points to Melvin Grant's testimony, both in his deposition and at trial, that he met with Ramji at the Chick-fil-A on August 30th because he believed that he was "under contract" with Stassi through the 29th. However, Grant also testified as follows:

---

[8]     Additionally, there was evidence that the "A-B contracts" would not automatically terminate upon the passing of a closing date. Instead, the contracts would terminate once a party gave a notice of termination. Here, Melvin and Melvina Grant signed notices of termination dated August 31, 2014, and Regina Gray signed a notice of her termination on August 29, 2014. This too, is some evidence, that the "A-B contracts" were still in effect at the time that Ramji and Grant signed the Chick-fil-A contracts.

11

Q: Now there's been some testimony that you were pretty sure at your deposition you remember that meeting happen—happening on August 30th, correct? Meeting at Chick-fil-A?

A: Correct.

Q: Looking at these documents and seeing this signature, is it possible that you got that date wrong in your head?

A: It's possible.

Thus, the jury heard conflicting evidence about the date the Chick-fil-A contracts were signed. Ramji testified multiple times that they were signed on August 29th, the title company "receipted" it on August 29th, and Grant contradicted his earlier testimony by conceding that it was "possible" that the contracts were signed on August 29th. In contrast, Grant testified in his deposition that the contract was signed on August 30th. When presented with such inconsistencies, the jury may believe one witness and disbelieve other, and it may resolve inconsistencies in the testimony of any witness. *McGalliard*, 722 S.W.2d at 697. The evidence supporting the trial court's finding is not against the great weight and preponderance of the evidence.

*Damages*

Although not raised as a separate issue on appeal, Ramji complains that there is no evidence that 6100 Clarkson suffered any damages as a result of Ramji's tortious interference because the measure of damages was improperly calculated. Essentially, Ramji contends that 6100 Clarkson should not have been awarded the

difference between the "A-B contracts" and the price it planned to "flip" the properties to Ramji for, but should have been awarded the difference between the original "A-B contract" price and the amount that the Grants eventually sold the property for in 2016.

In Jury Question 3, the jury was instructed to "[c]onsider the following elements of damages [for 6100 Clarkson's tortious interference claim], if any, and none other":

> The difference, measured at the time of the interference, between the amount [6100 Clarkson] would have made on the sale of the properties to [Ramji], and the amount they agreed to pay for those properties.

The jury answered $254,358.00, which is the amount that 6100 Clarkson would have made had it been able to "flip" the properties to Ramji as planned.

Although Ramji characterizes this issue as one of evidence sufficiency, his substantive argument is that Jury Question 3 presents an improper measure of damages. "A party objecting to a charge must point out distinctly the objectionable matter and the grounds of the objection. Any complaint as to a question, definition, or instruction, on account of any defect, omission, or fault in pleading, is waived unless specifically included in the objections." TEX. R. CIV. P. 274;

At the charge conference, Ramji objected to the use of the word "damages" in Jury Question 3 and requested that the term "lost profits" be used instead. He also objected that "the instruction on the elements of damages is defective *because there*

13

*is no evidence that there was a pending sale of the properties to [Ramji] at the time of the alleged interference.*" However, he never objected to the instruction using the difference between the price that 6100 Clarkson had to agreed to pay the Clarks and "the amount [it] would have made on the sale of the properties to [Ramji]," nor did he suggest or request that the jury be instructed to look at the 2016 sales price price of the properties in calculating the damages. Thus, to the extent that Ramji is complaining about the instruction regarding the measure of damages submitted to the jury in Jury Question 3, the issue is waived. *See State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 241 (Tex. 1992*); see also Tribble & Stephens Co. v. Consol. Servs., Inc.*, 744 S.W.2d 945, 949 (Tex. App.—San Antonio 1987, writ denied) (holding that defendant waived right to complain on appeal that plaintiff offered insufficient evidence of proper measure of damages because defendant failed to point out to trial court that improper measure of damages was submitted to jury). Thus, damages are measured by the instruction given. *See Equistar Chems., L.P. v. Dresser-Rand Co.*, 240 S.W.3d 864, 868 (Tex. 2007).

Here, there was evidence that Stassi agreed to pay the Clarks $650,026 and 6100 Clarkson, Stassi's assignee, would have resold the property to Ramji for $904,384, for a difference of $254,358, which is the exact amount the jury awarded. Thus, the evidence is legally and factually sufficient to support the damages under the charge given.

14

Because we have found the evidence legally and factually sufficient to support the judgment on 6100 Clarkson's tortious interference claims, we overrule issue one.

***Breach of Contract***

Regarding the Grants' breach-of-contract claims against Ramji, the jury charge asked:

> Did [Ramji] fail to comply with the terms of any of the following agreements to purchase the properties located at 0 Clarkson, 6102 Clarkson, and 6104 Clarkson?

The jury responded "yes" as to all three properties.

In issue three, Ramji argues that the evidence is legally and factually insufficient to support the jury's findings that he breached a contract to purchase these properties from the Grants "after the Grants testified that the sole reason that the sale of the Grant Properties to [Ramji] did not occur was because of the filing of a *lis pendens* by 6100 Clarkson."

The essential elements of a breach of contract claim are (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained as a result of the breach. *B & W Supply, Inc. v. Beckman*, 305 S.W.3d 10, 16 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

Here, Ramji's argument is that "[t]he Grants' breach of contract claims fail because those contracts did not close and fund due to the Grants' failure to be able

15

to tender marketable title upon the closing date (because of the *lis pendens* filed by 6100 Clarkson)." As such, he is attacking the fourth element of a breach-of-contract claim, i.e., that the damages were caused by his breach. Ramji's argument is, in effect, that his performance was excused because of a prior material breach by the Grants, i.e., that they failed to deliver marketable title because of the *lis pendens.*

When one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance. *PAJ, Inc. v. Hanover Ins. Co.*, 243 S.W.3d 630, 633 (Tex. 2008). However, the contention that a party is excused from its contract performance by the other party's prior material breach is an affirmative defense. *Henry v. Masson*, 333 S.W.3d 825, 834 (Tex. App.—Houston [1st Dist.] 2010, no pet.). The question of whether a party's breach of a contract will render the contract unenforceable against the other party generally presents a dispute for resolution by the trier of fact. *Id.* at 835. Moreover, the party relying on an affirmative defense has the burden to obtain findings of fact on the issue. *XCO Prod. Co. v. Jamison*, 194 S.W.3d 622, 635 (Tex. App.—Houston [14th Dist.] 2006, pet. denied).

Here, Ramji never pleaded a prior material breach as an affirmative defense to the Grants' contracts; more importantly he did not request or obtain a jury finding on it. As such, he may not complain for the first time on appeal that his performance was excused by the Grants' prior material breach.

16

Ramji also challenges the first element of breach of contract—the existence of a valid contract—at least as it applies to the sale of 6102 Clarkson Lane, owned jointly by Melvin Grant and his sister, Melvina. Specifically, Ramji argues that the agreement to sell the property is unenforceable, at least as to Melvina's share of the property, because she never actually signed the sales agreement.

A contract for the conveyance of real property must comply with the statute of frauds to be enforceable. *Lewis v. Adams*, 979 S.W.2d 831, 834 (Tex. App.—Houston [14th Dist.] 1998, no pet.). To comply with the statute of frauds, the contract must be in writing and signed by the party to be charged with the agreement. TEX. BUS. & COM. CODE ANN. § 26.01(a). However, the statute of frauds, too, is an affirmative defense to the enforcement of a contract, which must be pleaded or it is waived. TEX. R. CIV. P. 94; *Swinehart v. Stubbeman, McRae, Sealy, Laughlin & Browder, Inc.*, 48 S.W.3d 865, 875 (Tex. App.—Houston [14th Dist.] 2001, pet. denied); *Engelman Irrigation Dist. v. Shields Bros., Inc.*, 960 S.W.2d 343, 353 (Tex. App.—Corpus Christi 1997), pet. denied, 989 S.W.2d 360 (Tex. 1998) (per curiam). Again, the party relying on an affirmative defense has the burden to obtain findings of fact on the issue. *XCO Prod. Co.*, 194 S.W.3d at 635.

Here, Rajmi never pleaded the statute of frauds as an affirmative defense to Melvine's contract, nor did he request or obtain a jury finding on it. As such, he

17

may not complain for the first time on appeal that Melvine's contract is invalid because she never signed it.

Accordingly, we overrule issue three.

### *Negligent Misrepresentation*

In Jury Question 7, the jury found that [Ramji] "[made] a negligent misrepresentation on which the Grants justifiably relied entering upon into any of the following agreements to purchase [the Grants' properties." In Jury Question 8, the jury awarded the Grants $3,096.51 for each of the three properties. However, the Final Judgment does not include any award to the Grants based on the negligent misrepresentation findings.

In issue four, Ramji contends the evidence is legally and factually insufficient to support the jury's findings on the Grants' negligent misrepresentation claims. However, because the Final Judgment does not include an award to the Grants based on the negligent misrepresentation findings, error, if any, by the trial court in denying Ramji's post-judgment motions on the negligent misrepresentation issues, is harmless.

We overrule issue four.

## AFFIRMATIVE DEFENSE OF JUSTIFICATION

18

The jury charge included the following justification affirmative defense question regarding the tortious interference claims:

> Did Saahir Ramji have a good-faith belief that he justifiably could discuss, negotiate, and enter into contracts for the purchase of the four tracts of land owned by the Grant family to protect his own financial interest?

The jury responded, "No," as to each of the properties.

In issue three, Ramji attacks the jury's negative findings on his justification defense to the tortious interference claims. Specifically, Ramji claims that the evidence established as a matter of law that [he] had a good faith belief that he was "justified in seeking to purchase the Grant Properties from the Grants[.]"

### *Standard of Review and Applicable Law*

When a party attacks the legal sufficiency of an adverse finding on an issue on which he has the burden of proof, he must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001); *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989). In reviewing a "matter of law" challenge, the reviewing court must first examine the record for evidence that supports the finding, while ignoring all evidence to the contrary. *Dow*, 46 S.W.3d 241; *Sterner*, 767 S.W.2d at 690. If there is no evidence to support the finding, the reviewing court will then examine the entire record to determine if the contrary proposition is established as a matter of law. *Dow*, 46 S.W.3d at 241; *Sterner*, 767 S.W.2d at 690.

19

The point of error should be sustained only if the contrary proposition is conclusively established. *Dow*, 46 S.W.3d at 241; *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983).

When a party attacks the factual sufficiency of an adverse finding on an issue on which he has the burden of proof, he must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence. *Dow*, 46 S.W.3d at 242; *Croucher*, 660 S.W.2d at 58. The court of appeals must consider and weigh all the evidence and can set aside a verdict only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Dow*, 46 S.W.3d at 242; *see Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986). In doing so, the court of appeals must "detail the evidence relevant to the issue" and "state in what regard the contrary evidence greatly outweighs the evidence in support of the verdict." *Dow*, 46 S.W.3d at 242.

Justification is an affirmative defense to tortious interference with contract. *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77–78 (Tex. 2000). Even when a plaintiff presents evidence of each element of tortious interference, a defendant still may prevail by establishing the affirmative defense of justification. *Tex. Beef Cattle Co. v. Green*, 921 S.W.2d 203, 210 (Tex. 1996). The justification defense is based on either the exercise of (1) one's own legal rights or (2) a good-faith claim to a colorable legal right, even though that claim ultimately

20

proves to be mistaken. *Id.* at 211; *Sakowitz, Inc. v. Steck*, 669 S.W.2d 105, 107 (Tex. 1984), *overruled on other grounds by Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989).

*Analysis*

Ramji argues that "no reasonable jury could find that Ramji did not have a good-faith belief that, as of Saturday, August 30, 2014, after the contracts between Grant and 6100 Clarkson had expired and were no longer valid and enforceable, he could justifiably negotiate and enter into contracts with the Grants."

Ramji's justification defense is based on the same argument that he made in issue one regarding the sufficiency of the evidence to support the tortious interference finding, i.e., that the "A-B contracts" expired on August 29, 2014, and that he, in good faith signed the Chick-fil-A contracts the next day.

For the same reasons that we found the evidence legally and factually sufficient in issue one, we also conclude that there is legally and factually sufficient evidence to support the jury's rejection of Ramji's affirmative defense.

## SETTLEMENT CREDITS

In issue five, Ramji contends the "trial court erred in denying [Ramji's] Post-Judgment Motion requesting application of a $50,000 settlement credit against economic damages awarded the Grants and against Beason for pretrial settlement monies received by the Grants from Alamo Title for the same injuries." Under this

21

one issue, Ramji raises three distinct claims: (1) that the Grant's breach-of-contract damages should have been reduced by a $50,000 settlement credit that the Grants received from Alamo Title based on the Grants' claims against Alamo Title for negligent misrepresentation; (2) that the damages that the jury awarded to the Grants on their negligent misrepresentation claims, and which Ramji claims reflect the amount of the Grants' property taxes, are duplicative of other awards; and (3) that 6100 Clarkson's damages should be modified by subtracting 6100 Clarkson's closing costs. We address each contention respectively.

*Settlement Credit—the Grants*

In a single paragraph of his brief, and with a single citation to *Crown Life Ins. v. Casteel*, 22 S.W.3d 378, 390 (Tex. 2000), Ramji argues that the Grants received a $50,000 settlement from Alamo Life for their tortious interference claims against the title company and that the breach-of-contract damages that the Grants obtained from Ramji as a result of the breach of the Chick-fil-A contracts should be reduced by that amount because they were for the "same injury." However, Ramji provides no argument or authority analyzing *Casteel* or its progeny[9] or how the one-satisfaction rule should have been applied in this case. A party must not only cite relevant authority and the record but must also provide substantive legal analysis.

---

[9] We note that *Casteel* has been cited in reference to settlement credits in almost 80 appellate opinions, none of which are cited or discussed by appellant.

22

*Smith v. Smith*, 541 S.W.3d 251, 260–61 (Tex. App.—Houston [14th Dist.] 2017, no pet.) It is not our duty to fashion a legal argument for a party. *Guimaraes v. Brann*, 562 S.W.3d 521, 538 (Tex. App.—Houston [1st Dist.] pet. filed) (citing *Canton-Carter v. Baylor Coll. of Med.*, 271 S.W.3d 928, 931–32 (Tex. App.—Houston [14th Dist.] 2008, no pet.)). There being no substantive legal analysis, the briefing on this issue is inadequate. The issue is waived.

However, even if we were to consider the merits, the record in this case is inadequate to show trial court error. In a recent decision, *Sky View at Las Palmas, LLC v. Mendez*, 555 S.W.3d 101 (Tex. 2018), the Texas Supreme Court applied the one-satisfaction rule to a settlement credit. The court held that the nonsettling defendant seeking the settlement credit has the burden to prove its right to the credit. The defendant may introduce the settlement agreement or other evidence of the settlement amount. *Id.* at 107–08 (citing *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 927 (Tex. 1998)). The burden then shifts to the plaintiff to show that certain amounts should not be credited. *Id.* (citing *Utts v. Short*, 81 S.W.3d 822, 828 (Tex. 2002)). The plaintiff can rebut the presumption that the nonsettling defendant is entitled to a settlement credit by presenting evidence showing that the settlement proceeds would not amount to a double recovery. *Id.*

Although Ramji claims in his brief that he is entitled to receive a settlement credit for monies that Alamo Title paid to the Grants, the record does not show that

Ramji introduced evidence proving such entitlement. His post-judgment motion does not have any evidence attached. And, although a hearing was held on his post-judgment motions, we have no record of that proceeding and no indication that it was an evidentiary hearing. Ramji does not allege that the record contains the settlement agreement between the Grants and Alamo Title, nor does he point to anything else in the record that establishes the amount and terms of the settlement.[10] Appellant's brief contains what purports to be a calculation of the settlement credit, but it contains no citations to the record.

As such, based on the record before us, we cannot conclude that Ramji proved his right to a credit, thus the burden never shifted to the Grants to show that the damages would not amount to a double recovery.

*Duplicative Award for Property Taxes—the Grants*

Ramji argues that "the jury's answer to question 8 (negligent misrepresentation) should be set aside and the damages accordingly reduced in the Final Judgment" because they are the same property taxes awarded in Jury Question 4 (tortious interference). However, we have already noted that the Final Judgment does not include any award to the Grants based on either Jury Question 4 or Jury Question 8. The Grants recovered only on their breach-of-contract claims.

---

[10]  The Final Judgment acknowledges a settlement between Alamo Title and the Grants, but it provides no information about the amount or terms of the settlement.

24

*Closing Costs—6100 Clarkson*

Ramji also contends that "6100 Clarkson's damages should be modified by subtracting 6100 Clarkson's closing costs from the gross sales price, including brokers' commissions, sales expenses and prorations." However, his brief provides no authority or argument on this issue, thus is waived. TEX. R. APP. P. 38.1(i).

We overrule issue five.

## CONCLUSION

We affirm the trial court's judgment.


Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Goodman and Countiss.