**Motion to Correct Judgment Granted; Opinion of September 1, 2022 Withdrawn; Reversed and Rendered and Substitute Opinion filed November 8, 2022.**



**In The**

# Fourteenth Court of Appeals

---

### NO. 14-21-00122-CV

---

### BRYAN C. WAGNER AND DUER WAGNER III, Appellants

### V.

### EXXON MOBIL CORPORATION, Appellee

---

**On Appeal from the 189th District Court
Harris County, Texas
Trial Court Cause No. 2009-60726**

---

### S U B S T I T U T E   O P I N I O N

We construe Exxon Mobil Corporation's "Motion to Correct the Fourth Sentence of the Judgment" as a motion for rehearing and grant the motion. We withdraw our opinion and judgment dated September 1, 2022, and issue the following substitute opinion and judgment.

Exxon Mobil Corporation ("Exxon") sued Bryan C. Wagner and Duer

Wagner III (together, the "Wagners") over the Wagners' alleged indemnity obligations with respect to Exxon's settlement of two Louisiana lawsuits. The parties proceeded to trial and the jury returned a verdict in favor of Exxon, finding that the two settlements were reasonable and made in good faith. Exxon moved for judgment on the verdict and asked the trial court to award it the full amount it paid for both settlements — approximately $71 million. The Wagners filed a motion for judgment notwithstanding the verdict ("JNOV").

The trial court signed a final judgment that granted in part the Wagners' JNOV motion and awarded Exxon a total of $28.22 million for its settlement of the Louisiana lawsuits. The Wagners appealed and raise five issues challenging (1) the viability of Exxon's indemnity claims and the evidence offered in support; (2) this court's prior decision in a pretrial mandamus proceeding; and (3) the prejudgment interest awarded in the trial court's final judgment. Exxon filed a cross-appeal and asserts the trial court erred by granting in part the JNOV motion and reducing the award for the settlements.

For the reasons below, we reverse the trial court's judgment, reinstate the jury's verdict, and render judgment in accordance with that verdict.

## BACKGROUND

In 1994, the Wagners and Exxon executed an Agreement to Purchase and Sell (the "PSA"), through which the Wagners acquired from Exxon certain oil and gas interests in Louisiana. The parties also executed an Assignment, Bill of Sale and Quitclaim (the "Assignment") to effectuate the property transfer.[1] The Assignment transferred from Exxon to the Wagners a 50% interest in a mineral

---

[1] Along with the Wagners, two other parties also entered into the 1994 transaction with Exxon: Trade Exploration Corp. and James D. Finley. Exxon asserted claims against Trade Exploration Corp. and Finley in the underlying proceeding. For the reasons discussed below, Trade Exploration Corp. and Finley are not parties to this appeal.

servitude encumbering over 120,000 acres in north Louisiana. The other half of this mineral servitude was owned by Tensas Delta Land Company ("Tensas Delta").

The parties agreed that, as part of the purchase and sale, the Wagners would indemnify Exxon for certain liabilities, including damages arising from environmental claims.

In 2006, Exxon, the Wagners, and Tensas Delta were sued in three Louisiana lawsuits: *M.J. Farms*, *Agri-South*, and *Avahoula Resources*. Alleging environmental contamination, the plaintiffs in these suits sought remediation of the property previously conveyed from Exxon to the Wagners in the 1994 transaction.

*M.J. Farms* was the first case set for trial. In its pre-trial rulings, the Louisiana trial court held that Exxon and Tensas Deltas owned the property's mineral servitude despite the 1994 conveyance to the Wagners.[2] The trial court determined the Wagners were leaseholders with respect to the property and severed the claims against them into a different lawsuit.

Two weeks into the *M.J. Farms* trial, Exxon and Tensas Delta settled with plaintiff M.J. Farms for $59 million — $57.5 million of which was paid by Exxon. *Agri-South* was settled for $14.11 million and *Avahoula* settled for no cost.

In September 2009, Exxon sued the Wagners in the underlying proceeding, seeking indemnification for the *M.J. Farms* and *Agri-South* settlements. To aid their defense, the Wagners moved to compel the production of certain documents pertinent to Exxon's defense and settlement in the *M.J. Farms* litigation. Exxon

---

[2] Under the Louisiana Mineral Code, the mineral servitude owner is the party responsible for restoration obligations. *See* La. R.S. 31:22 ("The owner of a mineral servitude . . . is obligated, insofar as practicable, to restore the surface to its original condition at the earliest reasonable time.").

resisted the motion to compel by invoking the attorney-client privilege. The trial court determined that Exxon waived the attorney-client privilege by offensive use and ordered the production of specific documents.

Exxon filed a petition for writ of mandamus in this court, which was conditionally granted. *See In re Exxon Mobil Corp.*, 389 S.W.3d 577 (Tex. App.— Houston [14th Dist.] 2012, orig. proceeding [mand. denied]). This court ordered the trial court to vacate its order compelling Exxon to produce the privileged documents at issue. *Id*. at 583.

In March 2016, the parties announced ready for trial. At that time, another defendant, James Finley, reached a settlement with Exxon. Exxon non-suited its claims against Finley and the parties agreed that the Finley settlement would be credited against any judgment for Exxon.

After the close of evidence, the charge asked the jury whether the *M.J. Farms* and *Agri-South* settlements were "made in good faith and reasonable and prudent under the circumstances." The jury responded "Yes" for both settlements. Exxon sought judgment on the jury's verdict and asked the court to award it the full amounts paid for the *M.J. Farms* and *Agri-South* settlements: $57.5 million and $14.11 million, respectively. The Wagners filed a JNOV motion and sought a directed verdict in their favor on both the *M.J. Farms* and *Agri-South* settlements.

On December 31, 2018, the trial court signed two judgment-related orders, the first of which granted in part the Wagners' JNOV motion. Reasoning that Exxon "clearly received valuable consideration in the settlement in the form of collateral transactions for which the [Wagners] had not indemnified Exxon," the trial court held that Exxon failed to prove "an allocation of the [*M.J. Farms*] settlement between non-indemnity consideration and indemnified losses." The trial court disregarded the jury finding in part and determined that only $14.11

4

million of the *M.J. Farms* settlement "should be considered applicable to the indemnified claims.".

The trial court's second order was styled an "Interlocutory Judgment" and instructed the parties to recalculate prejudgment interest. After this order was signed, Exxon appealed and the Wagners filed a cross-appeal. This court dismissed the appeal for lack of jurisdiction, concluding that the trial court's "Interlocutory Judgment" did not constitute a final judgment. *See Exxon Mobil Corp. v. Trade Expl. Corp.*, No. 14-19-00091-CV, 2020 WL 7214159, at *7 (Tex. App.—Houston [14th Dist.] Dec. 8, 2020, no pet.) (mem. op.).

The trial court signed a final judgment on December 23, 2020. The final judgment retains the amounts awarded to Exxon in the "Interlocutory Judgment": $14.11 million each for the *M.J. Farms* and *Agri-South* settlements, for a total of $28.22 million. The final judgment also awards prejudgment interest.

The Wagners appealed and Exxon filed a cross-appeal. On January 20, 2022, the case was abated due to the pending bankruptcy of Trade Exploration Corp. Exxon filed a motion to sever the case into two separate proceedings, one comprising the appeal between Exxon and the Wagners and the other comprising the appeal between Exxon and Trade Exploration Corp. This court granted the motion and the present proceeding comprises the appeal between Exxon and the Wagners.

**OVERVIEW**

The Wagners raise the following issues on appeal:

1.  Exxon's failure to allocate the *M.J. Farms* settlement between indemnified and non-indemnified benefits "dooms any judgment."

2.  Exxon's indemnity claim arising from the *M.J. Farms* settlement is

5

barred by res judicata.

3. The evidence is legally and factually insufficient to warrant the submission of and the jury's responses to the charge questions inquiring about the reasonableness of the *M.J. Farms* and *Agri-South* settlements.

4. This court's prior decision in the mandamus proceeding was incorrect.

5. The prejudgment interest assessed in the final judgment should be tolled "due to Exxon's delays."

In its cross-appeal, Exxon raises two issues: (1) the trial court erred by disregarding the jury's finding with respect to the *M.J. Farms* settlement; and (2) the Wagners forfeited the right to challenge the *M.J. Farms* settlement amount.

For the reasons below, we overrule the Wagners' issues on appeal and sustain Exxon's issue challenging the trial court's partial grant of the Wagners' JNOV motion.

## ANALYSIS

### I. The Wagners' Issues

#### A. The Scope of the Wagners' Indemnity Obligations

The Wagners raise two arguments in their first issue: (1) Exxon's failure to allocate between indemnified and non-indemnified benefits in the *M.J. Farms* settlement is fatal to its recovery, and (2) the Wagners did not agree to indemnify Exxon for damages arising from plugged and abandoned wells. We consider these contentions separately, beginning with the Wagners' allocation argument.

#### 1. Allocation of the M.J. Farms Settlement

Inquiring about the reasonableness of the *M.J. Farms* settlement, Question No. 2 was submitted to the jury as follows:

6

> Was ExxonMobil's settlement of the *M.J. Farms* litigation in 2011 . . . made in good faith and reasonable and prudent under the circumstances?
>
> The question whether a settlement is reasonable, prudent, and in good faith is an objective determination, not a subjective one. An objective determination is one that is measured by objective standards, not the subjective or personal views of the person or entity making the determination.
>
> In determining the issues of reasonableness, prudence, and good faith, you may consider factors such as the identity of the parties, the damage elements claimed by a plaintiff, the defenses asserted by the defendant, settlement amounts agreed to in similar cases, the complexity of the case, the strength and resources of the counsel for the settling parties, and such other factors as you may think are pertinent to the issue.

The jury responded, "Yes."

Challenging this finding, the Wagners assert that Exxon's failure to allocate the *M.J. Farms* settlement between those benefits that were covered by the parties' indemnity agreements and those that were not is fatal to any recovery. The Wagners base this argument on precedent examining allocation in the context of attorney's fees and insurance. *See Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 314 (Tex. 2006) ("[I]f any attorney's fees relate solely to a claim for which such fees are unrecoverable, a claimant must segregate recoverable from unrecoverable fees."); *Comsys Info. Tech. Servs., Inc. v. Twin City Fire Ins. Co.*, 130 S.W.3d 181, 198 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) ("Because the insured can recover only for covered events, the burden of segregating the damages attributable solely to the covered event is a coverage issue for which the insured carries the burden of proof.").

Specifically, the Wagners contend that Exxon received benefits from the *M.J. Farms* settlement that exceed the indemnity agreements in the PSA and the

Assignment, including (1) the right of first refusal to purchase the 32,000 acre farm; (2) plaintiff M.J. Farms' assignment of its claims to Exxon; and (3) plaintiff M.J. Farms' dismissal of the "Part B and Part C lawsuits".[3] The Wagners also point out that Exxon's witnesses testified at trial that Exxon could not and did not separate what was paid for the non-indemnifiable benefits.

In response, Exxon points out that the Wagners did not object to the charge, so their complaint must be evaluated in light of the charge as submitted. Citing the language of Question No. 2, Exxon asserts that sufficient evidence supports the jury's "Yes" response.

### a.      Standard of Review and Governing Law

This court previously has delineated the showing required for a settling indemnitee seeking to recover the amount of the settlement from its indemnitor: "the indemnitee must show its potential liability to a claimant and show that the settlement was reasonable, prudent, and made in good faith under the circumstances." *Amerada Hess Corp. v. Wood Grp. Prod. Tech.*, 30 S.W.3d 5, 11 (Tex. App.—Houston [14th Dist.] 2000, pet. denied); *see also Fireman's Fund Ins. Co. v. Com. Standard Ins. Co.*, 490 S.W.2d 818, 824 (Tex. 1972), *overruled on other grounds by Ethyl Corp. v. Daniel Constr. Co.*, 725 S.W.2d 705, 708 (Tex. 1987). These standards were incorporated into the wording of Question No. 2, which asked the jury whether the *M.J. Farms* settlement was "made in good faith and reasonable and prudent under the circumstances."

The Wagners did not object to the wording of Question No. 2 on the grounds they advance here regarding the necessity of allocation. Accordingly, we judge the sufficiency of the evidence by the legal standards contained in the trial court's

_____

[3] The Wagners assert the "Part B and Part C lawsuits" are different servitudes that do not invoke the Wagners' indemnification obligation under the PSA and the Assignment.

charge. *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000); *Deluxe Barber Sch., LLC v. Nwakor*, 609 S.W.3d 282, 293 (Tex. App.—Houston [14th Dist.] 2020, pet. denied).

Evidence is legally insufficient to support a jury finding when (1) there is a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to support a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence conclusively establishes the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). For this analysis, we consider the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *Id*. at 822. We credit favorable evidence if a reasonable fact finder could and disregard contrary evidence unless a reasonable fact finder could not. *Id*.

In applying these standards, we are mindful that the trier of fact is the sole judge of the witnesses' credibility and the weight afforded to their testimony. *Id*. at 819-20. We may not pass upon the witnesses' credibility or substitute our judgment for that of the fact finder, even if the evidence would support a different result. *4922 Holdings, LLC v. Rivera*, 625 S.W.3d 316, 325 (Tex. App.—Houston [14th Dist.] 2021, pet. denied).

### b.    Evidence and Application

Question No. 2 gave the jury wide latitude on the factors it could consider in determining whether the *M.J. Farms* settlement was reasonable, including "the identity of the parties, the damage elements claimed by a plaintiff, the defenses asserted by the defendant, settlement amounts agreed to in similar cases, the complexity of the case, the strength and resources of the counsel for the settling parties, and such other factors as you may think are pertinent to the issue."

9

Considered in light of these instructions, the jury's finding that the *M.J. Farms* settlement was reasonable is supported by sufficient evidence.

The jury heard testimony from Exxon's witnesses discussing the progression of the *M.J. Farms* litigation in Louisiana, from its filing through the signing of the final settlement agreement. Plaintiff M.J. Farms filed suit in April 2006 against Exxon, Tensas Delta, and five other companies, alleging that the companies' oil and gas operations caused environmental damage. In a supplemental petition, plaintiff M.J. Farms added the Wagners as defendants.

According to Jason Bergeron, one of Exxon's attorneys, the trial court's March 2009 scheduling order set trial for November 2009.[4] Testifying at trial, Bergeron said Exxon's outside counsel sent a "tender letter" to the Wagners, which "request[ed] that the Wagner Group defend and indemnify Exxon Mobil against the claims at issue in M.J. Farms." In a May 2009 letter, the Wagners "decline[d] to accept" Exxon's request for defense and indemnity.

Judge Leo Boothe was assigned to the case as presiding judge. Bergeron testified that Exxon, the Wagners, and certain other defendants filed a motion to recuse Judge Boothe because of "what we perceive[d] to be some conflicts that he had with the underlying litigation." Bergeron described two conflicts in particular: (1) Judge Boothe or a member of his family allegedly owned an interest in one of the mineral leases at issue; and (2) Judge Boothe had a close relationship with a person related to Michael Johnson, the owner of plaintiff M.J. Farms. The motion to recuse was denied and the defendants appealed the ruling.

---

[4] Bergeron said that, after the filing of the *M.J. Farms* petition, plaintiff M.J. Farms challenged the constitutionality of Louisiana Act 312, which referred to a "series of statutes that the legislature implemented in order to govern how these types of lawsuits are basically tried with respect to the regulatory cleanup aspect . . . and how cleanups actually get accomplished." This challenge "brought everything to a standstill" until the stay was lifted in 2009.

While the appeal was pending, Judge Boothe made several pivotal rulings in the case. Importantly, Judge Boothe ruled that Exxon and Tensas Delta were the current owners of the mineral servitude at issue and that the Wagners owned only a "leasehold interest." In addition, Judge Boothe issued the following rulings:

- Judge Boothe denied Exxon's subsequent purchaser defense and permitted plaintiff M.J. Farms to seek damages for what had occurred before it purchased the property.

- With respect to the obligation to restore the property's "surface," Judge Boothe ruled that "surface" included "everything from ground level down to the core of the Earth."

- Judge Boothe denied Exxon's statute of limitations defense.

- Judge Boothe ruled that Exxon could be held "solidarily bound" with Tensas Delta with respect to any damages assessed, which meant that plaintiff M.J. Farms could "recover 100 percent of its damages" from either party.

- Judge Boothe severed plaintiff M.J. Farms' claims against the Wagners into a separate cause of action.

Reviewing the denial of the motion to recuse Judge Boothe, the Louisiana Supreme Court determined that Judge Boothe would no longer continue as the case's presiding judge. Judge Glenn Strong took over as presiding trial judge. Exxon "file[d] a series of motions for reconsideration to have Judge Strong revisit Judge Boothe's prior rulings" but Judge Strong denied the motions. Judge Strong also made several rulings limiting Exxon's presentation of its defense:

- Judge Strong excluded testimony from one of Exxon's experts who would have presented evidence "to show the value of the property and demonstrate how it was disproportionate to the damage claims."

- Judge Strong did not permit Exxon to question plaintiff M.J. Farms' expert on "whether or not the Corps of Engineers would approve" his recommended remediation project.

- Judge Strong did not permit Exxon to put on evidence showing that similar remediation plans proposed by plaintiff M.J. Farms' expert

11

had not been implemented.

- Judge Strong precluded Exxon from offering evidence to show that plaintiff M.J. Farms' actions contributed to the claimed damages.

- Judge Strong did not permit Exxon to present evidence that it had sold the mineral servitude at issue to the Wagners.

- Judge Strong allowed evidence of the Exxon Valdez incident[5] to be introduced at trial.

After additional delays, trial was scheduled to begin in March 2011. Exxon's expert in the underlying proceeding, Bernard McLaughlin, described the *M.J. Farms* litigation as "complex" and said it "was basically the trial of the century for Catahoula Parish." According to Bergeron, Catahoula Parish was comprised of approximately eight thousand people and, for jury selection, the parties "had four panels of approximately a hundred people each."

Plaintiff M.J. Farms' lead counsel was Mike Vernon, whom McLaughlin described as "very effective." According to Bergeron, during jury selection Vernon "referred to Exxon's size many times, the largest corporation in the world. He referred to how — the profits of the company in the last quarter, the last year, so that was a fairly frequent reference." Vernon also told the panel members that Michael Johnson, the owner of plaintiff M.J. Farms, would spend all recovered monies on the property's remediation.

Of the people selected to sit on the jury, Bergeron recalled that some of them previously had worked for or had family that worked for plaintiff M.J. Farms. Bergeron testified that several members of the jury also were friends with members of Michael Johnson's family.

Trial began on March 22, 2011. Plaintiff M.J. Farms called Austin Arabie as

---

[5] On March 24, 1989, the oil tanker Exxon Valdez ran aground in Prince William Sound, Alaska, spilling 11 million gallons of oil.

an expert witness. Arabie opined that oil and gas operations on the property caused contamination of the property's soil, shallow groundwater, and alluvial aquifer.[6] According to Arabie, the shallow groundwater contamination was caused by leakage from unlined earthen pits used to store water produced during oil and gas operations. Arabie also opined that contamination could be traced to saltwater injection wells used on the property. Arabie's proposed remediation plan cost approximately $3.9 billion, allocated as follows: $105,907,147 for soil remediation, $37,233,511 for shallow groundwater remediation, and $3,833,271,901 for aquifer remediation.

According to Bergeron, Arabie previously had served as an expert witness in *Corbello v. Shell*, a similar "legacy"[7] lawsuit filed in Louisiana. In *Corbello*, the jury returned a verdict for the plaintiff and assessed approximately $60 million in damages. Bergeron also said that Arabie's testimony in a separate case had been cited by the Louisiana Supreme Court as "providing the sufficient or necessary evidence to support the jury's verdict[.]"

Plaintiff M.J. Farms also relied on expert testimony from Bill Griffin. Bergeron described Griffin's theory of contamination as follows:

> So Mr. Griffin identified a series of saltwater disposal wells and plugged and abandoned wellbores that — within the boundaries of the alluvial aquifer plumb that Mr. Arabie delineated. According to Mr. Griffin, . . . [s]altwater that was injected into the saltwater disposal wells allegedly traveled back up these plugged and abandoned

---

[6] Alluvial aquifers are "relatively young aquifers in geologic time" that "consist of unconsolidated sand and gravel material." *See* Luke W. Harris & Christopher J. Sanchez, *Considerations for Analyzing Colorado Ground Water: A Technical Perspective*, 15 U. Denv. Water L. Rev. 105, 111 (2011). Alluvial aquifers are "relatively shallow and proximal to the surface stream systems that created the deposits." *Id*.

[7] "Legacy litigation" refers to hundreds of cases filed by landowners seeking damages from oil and gas companies for alleged environmental contamination in the wake of the Louisiana Supreme Court's decision in *Corbello v. Iowa Production*, 850 So.2d 686 (La. 2003).

wellbores and impacted the alluvial aquifer.

Bergeron testified that the *M.J. Farms* litigation settled after the close of evidence and the charge conference. Caj Boatright, one of Exxon's attorneys, was the "point person" when it came to the *M.J. Farms* settlement. According to Boatright, when he took over the *M.J. Farms* litigation in October 2010, the settlement demand pending from plaintiff M.J. Farms was $2.1 billion. Boatright recalled that, in February 2011, plaintiff M.J. Farms lowered its settlement demand to $635 million; Exxon responded with an offer of $15 million. Boatright testified that plaintiff M.J. Farms' next offer was for $475 million, to which Exxon responded with a $22 million offer.

During jury selection, plaintiff M.J. Farms offered $152 million to settle and Exxon counter-offered with $52 million. Settlement discussions remained at an impasse until the conclusion of trial, when plaintiff M.J. Farms offered $59 million to settle. Boatright offered Exxon's acceptance of the proposal, with $57.5 million to be paid by Exxon and $1.5 million to be paid by Tensas Delta. Boatright said the parties subsequently agreed on the settlement.

According to Boatright, in his settlement discussions with plaintiff M.J. Farms up to this point, the parties discussed only "the amount of money and a complete release from the M.J. Farms lawsuit claims[.]" Boatright said the parties had not discussed any additional terms of the settlement, including a right of first refusal, a surface-use agreement, an assignment of claims, or confidentiality. Boatright testified that the parties subsequently entered into a "Memorandum of Understanding" and, approximately seven weeks later, the parties signed a final settlement agreement. According to Boatright, the settlement amount did not change from the initial agreement through the signing of the final agreement.

Scott Sinclair, president of Tensas Delta, testified about Tensas Delta's role

14

in the *M.J. Farms* litigation and the ensuing settlement. According to Sinclair, Boatright approached him about the settlement negotiations with plaintiff M.J. Farms and asked if Tensas Delta "would want to make an offer to the plaintiffs to resolve its liability to them." Sinclair told Boatright they were interested in a settlement. Sinclair subsequently approached Tensas Delta's board of directors and received $1 million in settlement authority. According to Sinclair, the company's insurance carrier agreed to contribute an additional $500,000 to the settlement.

Sinclair recalled that, at the time of the settlement negotiations, Tensas Delta had approximately 15 employees, $1 million in cash, and $5.6 million in liquid assets. According to Sinclair, "prior to the parties sitting down and documenting" the settlement agreement, there had not been any discussion of the settlement's terms apart from the money and that plaintiff M.J. Farms agreed to a "full release" of Tensas Delta. Sinclair said it took approximately seven weeks to finalize the parties' settlement agreement. During this period, Sinclair said the settlement amount never changed.

Evaluating the course of the *M.J. Farms* litigation and the settlement, McLaughlin ultimately opined that the settlement was "made in good faith" and "reasonable and prudent." Reviewing the circumstances discussed above, McLaughlin stated that "Exxon faced a significant and serious exposure in this case to a very, very large damage award by the jury." Continuing on, McLaughlin testified that "there are numbers even higher than the settlement that I would still have considered to be reasonable, considering the risk and exposure Exxon Mobil faced." McLaughlin also referenced verdicts returned in other legacy cases, including $60 million in *Corbello*, $168 million in *Grefer*, $60 million in *Dore*, $42 million in *Marin*, and $54 million in *Savoie*.

15

Against this backdrop, the Wagners fully explored their contention that the settlement was unreasonable because it included indemnified and non-indemnified benefits.

At trial, the Wagners called Rick Sarver as an expert witness. Sarver is an attorney licensed in Lousiana and has practiced law for 35 years. Reviewing the *M.J. Farms* final settlement agreement, Sarver opined that "[t]here were a number of things that Exxon bought with its settlement money that were never agreed to by the [Wagners] to indemnify them for." Sarver identified the following non-indemnified benefits: settlements of two other legacy cases; a right of first refusal to purchase the farm acreage; confidentiality; and the assignment of plaintiff M.J. Farms' claims against other defendants, including Tensas Delta. When asked generally about the settlement's reasonableness, Sarver testified:

> The settlement, itself, wasn't in good faith. When you are trying to buy all these different items, many of which — most of which are not the responsibility of the defendants for any indemnity and then to attempt to hold those defendants responsible for things that you know they don't have any obligation for, that's not in good faith.

The Wagners also questioned Exxon's witnesses about the benefits that were allegedly outside the scope of the Wagners' indemnity obligations. The Wagners' counsel had the following colloquy with Boatright during his cross-examination:

> Q.    There's nothing in the agreement, itself, that indicates how much of the 57.5 million was paid for any of these items, is there?
>
> A.    57.5 [million] is paid for the release. It doesn't say how much was paid for these other ones because they came after we reached a deal on the money.
>
> Q.    It's true that Exxon cannot allocate how much of the 57.5 [million] was paid for any of these pieces; isn't that true? Isn't that true?

16

A. I don't know how to say it, other than we reached a deal on the money and these things came afterwards.

When asked if it was "true that the settlement agreement has a variety of things that Exxon received in exchange for $57[.5] million, and there is not a specific allocation for each of those things," Boatright responded: "True. The way you read it, true."

Exxon also called as a witness Jack Balagia, an attorney at Exxon who was involved in the *M.J. Farms* settlement. On cross-examination, Balagia confirmed that Exxon made no allocation of the sums it paid to settle the *M.J. Farms* litigation.

Considered together and in light of the charge's wording, this evidence is sufficient to support the jury's "Yes" response to Question No. 2. Specifically, the evidence supports the finding that Exxon's $57.5 million payment to settle the *M.J. Farms* litigation was "made in good faith and reasonable and prudent under the circumstances." Even though the Wagners' counsel elicited testimony showing the settlement was not reasonable because it included benefits allegedly outside their indemnity obligations, the jury was entitled to disregard this contrary evidence in reaching the finding under review. *See City of Keller*, 168 S.W.3d at 822.

### c. The Contractual Scope of the Wagners' Indemnity Obligations

Setting aside the evidence supporting the challenged finding, the breadth of the Wagners' indemnity obligations under the PSA and the Assignment does not support the argument that Exxon's alleged failure to allocate is fatal to its recovery for the *M.J. Farms* settlement.

The obligation to indemnify is a creature of contract and defined according to the terms therein. *See Griffin Indus., Inc. v. Foodmaker, Inc.*, 22 S.W.3d 33, 36

17

(Tex. App.—Houston [14th Dist.] 2000, pet. denied) ("The Supreme Court has stated that the question of whether indemnity exists is a rule of contract interpretation and should be determined by the court as a matter of law.") (citing *Fisk Elec. Co. v. Constructors & Assocs., Inc.*, 888 S.W.2d 813, 814 (Tex. 1994)); *DBHL, Inc. v. Moen Inc.*, 312 S.W.3d 631, 635 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) ("Courts may not expand the parties' rights and responsibilities beyond the limits defined in an indemnity contract."); *see also, e.g.*, *RKI Expl. & Prod., LLC v. Ameriflow Energy Servs., LLC*, No. 02-20-00384-CV, 2022 WL 2252895, at *8-20 (Tex. App.—Fort Worth June 23, 2022, no pet. h.) (mem. op.) (determining the scope of an indemnity obligation based on an examination of the operative agreement).

Here, the PSA and the Assignment set broad parameters for the Wagners' indemnity obligations. In relevant part, the first indemnity provision in the PSA states that the Wagners:

> agree to release, defend, indemnify, and hold Exxon . . . ***harmless from and against all damages, losses, expenses*** (including, but not limited to, court costs and attorneys' fees), civil fines, penalties, and other costs and liabilities ***as a result of claims, demands, and causes of action whether arising or made prior to or subsequent to the effective time or manifested in lawsuits filed prior to or subsequent to the effective time***, as a result of the following:
>
> (a) ***the ownership or the operation of, or any act or omission in connection with, the interests or property***, by buyer,[8] its employees, independent contractors, agents, successors or assigns, or by Exxon, its officers, directors, employees or agents, or by third parties, whether prior to or subsequent to the effective time;
>
> *     *     *
>
> Including, but not limited to: . . .
>
> (2) ***claims, demands, causes of action, costs, and expenses arising***

---

[8] The PSA defines the term "Buyer" to include the Wagners.

> ***out of, or in connection with, the plugging and abandoning and reabandoning of any wells***, removal or modification of facilities (including, but not limited to, flowlines and pipelines), ***closure of pits, and restoration of the surface***, regardless of whether the obligation to plug, abandon, reabandon, remove, modify, close, or restore arose prior to or subsequent to the effective time, whether such plugging, abandoning and reabandoning, removal, modification, closure or restoration was the obligation of Exxon, buyer, or third parties.

(emphasis added).

In the portion of the PSA entitled "Material Adverse Environmental Conditions," the Wagners agreed:

> ***to accept all responsibility and liability for the environmental condition of the property and interests pursuant to the terms of this agreement***, including, but not limited to, ***all existing and prospective claims***, causes of action, fines, losses, costs, and expenses, ***including, but not limited to, costs to cleanup or remediate*** in accordance with and to the extent required by law, and buyer, its successors and assigns hereby agree to release Exxon, its officers, directors, employees and agents from any and all liability and responsibility therefor and agree to indemnify, defend, and hold Exxon, its officers, directors, employees and agents ***harmless from any and all claims***, causes of action, fines, expenses, costs, losses, and liabilities ***whatsoever in connection with the environmental condition of the property, interests, or other property affected thereby*** (including, but not limited to, their active, passive, joint, concurrent or sole negligence or strict liability) or the failure of buyer, its successors or assigns to remediate property.

(emphasis added). Finally, the Wagners also agreed to indemnify Exxon for any claims "on account of . . . ***contamination or threat of contamination of natural resources*** (including, but not limited to, soil, air, surface water or ground water), or other threat to the environment" arising from any operations on the property before or after the PSA's effective date. (emphasis added). These same provisions were included in the parties' Assignment.

19

Read together, these provisions obligate the Wagners to indemnify Exxon for all damages, losses, and expenses (1) as a result of the Wagners' ownership of or any act taken in connection with the property; (2) arising out of the "closure of pits, and restoration of the surface"; (3) arising from the property's environmental condition, including "costs to cleanup or remediate"; and (4) sought by any person on account of contamination of natural resources. Considered in conjunction with the evidence at trial addressing the source and extent of the *M.J. Farms* environmental contamination, all costs related to the settlement of the *M.J. Farms* litigation likely fall within the scope of the Wagners' indemnity obligations as defined by the PSA and the Assignment.

In light of this conclusion and our evidentiary-sufficiency analysis above, we overrule the Wagners' allocation argument.

### 2. *Plugged and Abandoned Wells*

As discussed above, expert witness Griffin testified in the *M.J. Farms* litigation and opined that some of the contamination at issue was caused by injected saltwater that traveled up the wellbores of plugged and abandoned wells. On appeal, the Wagners argue that the 1994 transaction conveyed to them only those wells that were "abandoned" — not those that were "plugged and abandoned." This error, the Wagners contend, "fatally undermines the judgment because Exxon's payments to M.J. Farms and Agri-South encompassed damages arising from plugged and abandoned wells, for which no indemnity was owed."

During trial, the trial court admitted evidence on this point and submitted the issue to the jury as Question No. 1:

> Did ExxonMobil agree to sell and the Wagner Group agree to purchase plugged and abandoned wells in the 1994 purchase and sale agreement and the assignment in evidence as Plaintiff's Exhibits 1 and

2?

The jury responded, "Yes."

Our analysis of this issue begins with the documents that effected the 1994 transaction. The PSA conveyed to the Wagners:

> Exxon's interest in those certain oil and gas leasehold estates or other interests, as set forth in Exhibit A-1[9] . . . , together with Exxon's ownership interest in ***all wells*** (abandoned and unabandoned) located on the land described in Exhibit A-1.

(emphasis added). The Assignment incorporates the same definition of the interests conveyed from Exxon to the Wagners.

Well-settled principles of contract interpretation guide our analysis of these provisions. *See Port of Houston Auth. of Harris Cnty. v. Zachry Constr. Corp.*, 513 S.W.3d 543, 551 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). Our primary concern when interpreting a contract is to ascertain and give effect to the intent of the parties as expressed in the contract. *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006). Contract terms are given their plain, ordinary, and generally-accepted meanings, and contracts are to be construed as a whole in an effort to harmonize and give effect to all provisions. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005).

When a contract is ambiguous, its interpretation becomes a fact issue for the jury to resolve. *XCO Prod. Co. v. Jamison*, 194 S.W.3d 622, 627 (Tex. App.—Houston [14th Dist.] 2006, pet. denied). A contract is ambiguous if it is subject to two or more reasonable interpretations after applying the pertinent rules of contract construction. *Id*. The fact that the parties disagree about a contract's meaning

---

[9] Exhibit A-1 listed the leasehold interests covering approximately 120,000 acres in northern Lousiana, including those properties at issue in the *M.J. Farms* and *Agri-South* litigation.

21

does not necessarily render the contract ambiguous. *Polaris Guidance Sys., LLC v. EOG Res., Inc.*, 575 S.W.3d 85, 89 (Tex. App.—Houston [14th Dist.] 2019, no pet.).

The contract provision quoted above suggests a single interpretation regarding which wells were conveyed from Exxon to the Wagners: all of them. *See, e.g.*, *Project Dev. Grp., Inc. v. Metro. Transit Auth. of Harris Cnty.*, No. 07-96-0350-CV, 1998 WL 416131, at *4 (Tex. App.—Amarillo July 24, 1998, pet. denied) (not designated for publication) (noting the "undeniable fact that the plain, ordinary meaning of 'all' is 'all'").

The Wagners do not point to any provisions suggesting that "plugged and abandoned" wells are excluded from the conveyance of "all wells." Moreover, this contention is at odds with other provisions in the PSA and the Assignment delineating the Wagners' obligations with respect to plugged and abandoned wells.

For example, as set out more fully above in Section I.A.1.c., the Wagners agreed "to properly plug and abandon and reabandon, if necessary, all wells (abandoned and unabandoned)" and "to pay all costs and expenses associated with any such plugging and abandoning and reabandoning." This obligation to Exxon applied both before and after the transaction's 1994 effective date and included those wells for which the Wagners were "not the Operator." The Wagners also agreed to indemnify Exxon for any expenses "arising out of, or in connection with, the plugging and abandoning and reabandoning of any wells."

These provisions, read in conjunction with the interests conveyed in the PSA and the Assignment, show that the parties intended to convey all wells to the Wagners, including those that were plugged and abandoned. Therefore, the trial court erred in submitting a jury question asking whether plugged and abandoned wells were conveyed to the Wagners in the 1994 transaction. *See, e.g.*, *XCO Prod.*

22

*Co.*, 194 S.W.3d at 632 (holding that the trial court erred when it did not construe an unambiguous provision as a matter of law and, instead, submitted the issue to the jury). However, because the jury's finding is in accordance with the relevant provisions' unambiguous meaning, the error is harmless. *See* Tex. R. App. P. 44.1(a)(1); *XCO Prod. Co.*, 194 S.W.3d at 632.

We overrule the Wagners' challenge to the jury's finding in response to Question No. 1. Therefore, we overrule all arguments raised in the Wagners' first issue.

## B.    Res Judicata

Before delving into the Wagners' second issue, we begin with a brief overview of the relevant procedural history underlying their res judicata argument.

As discussed above, Judge Boothe (during the pre-trial stages of the *M.J. Farms* litigation) ruled that the Wagners were leaseholders with respect to the property at issue and that Exxon, in contrast, owned the mineral servitude. The trial court severed plaintiff M.J. Farms' claims against the Wagners and those claims proceeded independently of the claims asserted against Exxon and Tensas Delta.

Exxon and Tensas Delta subsequently settled with plaintiff M.J. Farms and, in the parties' final settlement agreement, plaintiff M.J. Farms "assign[ed] to ExxonMobil all Claims that it has, as of the date this Agreement is approved by the Court, against Wagner[10] . . . ."

After the final settlement agreement was signed, the Wagners filed a motion for summary judgment with respect to the severed claims asserted against them by

---

[10] The final settlement agreement defined "Wagner" to include Bryan C. Wagner and Duer Wagner III.

23

plaintiff M.J. Farms.  Pointing out that the final settlement agreement obligated Exxon to remediate the sites of the alleged contamination, the Wagners asserted that plaintiff M.J. Farms "has received full recovery for the claims it alleged in this case" and requested a judgment in their favor.

Exxon filed a response to the Wagners' summary judgment motion and argued that the Wagners remained liable for the remediation and that their remediation obligation exceeded the one in the final settlement agreement.  In a footnote, Exxon asserted:

> If [the trial court] finds that Plaintiff's settlement with ExxonMobil released Plaintiff's claims against the Wagner Defendants, then by operation of law, ExxonMobil is subrogated to Plaintiff's rights against Wagner for Wagner's virile portion ***in addition to any contractual indemnification rights that ExxonMobil has against Wagner***.

(emphasis added).  In March 2013, the Louisiana trial court granted the Wagners' motion for summary judgment and dismissed the claims asserted by plaintiff M.J. Farms.

On appeal here, the Wagners cite to the footnote in Exxon's summary judgment response and argue that the indemnity claims pursued in the underlying suit are barred by res judicata.  In response, Exxon contends that the Wagners (1) failed to conclusively prove res judicata, and (2) waived any res judicata defense.

The preclusive effect of a prior judgment is determined by the law of the state that issued the decision which, here, is Lousiana.  *See Purcell v. Bellinger*, 940 S.W.2d 599, 601 (Tex. 1997) (per curiam); *Charles Brown, L.L.P. v. Lanier Worldwide, Inc.*, 124 S.W.3d 883, 894 n.20 (Tex. App.—Houston [14th Dist.] 2004, no pet.).  Under Lousiana law, res judicata requires proof of the following:

(1) the judgment is valid; (2) the judgment is final; (3) the parties are the same; (4) the cause or causes of action asserted in the second suit existed at the time of the final judgment in the first litigation; and (5) the cause or causes of action asserted in the second suit arose out of the transaction or occurrence that was the subject matter of the first litigation. *Burguieres v. Pollingue*, 843 So.2d 1049, 1053 (La. 2003). "The doctrine of res judicata is *stricti juris* and, accordingly, any doubt concerning the applicability of the principle must be resolved against its application." *McCalmont v. McCalmont*, 297 So.3d 1057, 1063 (La. Ct. App. 2020) (internal quotation omitted).

Assuming without deciding that the March 2013 summary judgment satisfies the elements of res judicata in Louisiana, we conclude that the Wagners' failure to timely raise the defense in the underlying proceeding constitutes waiver.

The doctrine of res judicata is not absolute; rather, the defense may be waived in certain circumstances. *See* Restatement (Second) of Judgments § 26 (1982); *see also, e.g.*, *In re DEK-M Nationwide, Ltd.*, 627 S.W.3d 353, 363 (Tex. App.—Houston [14th Dist.] 2021, orig. proceeding) (applying section 26).[11]

Relevant here, res judicata does not bar a subsequent claim if "[t]he parties have agreed in terms or in effect that the plaintiff may split his claim, or the defendant has acquiesced therein[.]" Restatement (Second) of Judgments § 26(a)(1) (1982). A comment to this exception states:

> A main purpose of the general rule stated in § 24 is to protect the defendant from being harassed by repetitive actions based on the same claim. The rule is thus not applicable where the defendant consents, in express words or otherwise, to the splitting of the claim.

---

[11] Even though Louisiana substantive law controls the effect of the prior judgment, Texas procedural rules control how that effect is determined. *See Hercules Offshore, Inc. v. Excell Crane & Hydraulics, Inc.*, 454 S.W.3d 70, 77-78 (Tex. App.—Houston [1st Dist.] 2014, pet. dism'd).

      *        *        *

> Where the plaintiff is simultaneously maintaining separate actions based upon parts of the same claim, and in neither action does the defendant make the objection that another action is pending based on the same claim, the judgment in one of the actions does not preclude the plaintiff from proceeding and obtaining judgment in the other action. The failure of the defendant to object to the splitting of the plaintiff's claim is effective as an acquiescence in the splitting of the claim.

Restatement (Second) of Judgment § 26 cmt. a (1982). "This exception essentially operates as a waiver where the parties fail to object at the outset of the subsequent litigation." *Ganske v. WRS Grp., Inc.*, No. 10-06-00050-CV, 2007 WL 1147357, at \*6 (Tex. App.—Waco Apr. 18, 2007, no pet.) (mem. op.). Waiver is necessary "to discourage unsavory tactical maneuvers," such as when a party pursues separate litigation and then seeks to hide behind the first judgment rendered. *Id.* (citing *In re Matter of Super Van Inc.*, 92 F.3d 366, 371 (5th Cir. 1996)).

  This exception forecloses the res judicata defense advanced here. In the Louisiana litigation, the Wagners moved for summary judgment on the severed claims asserted against them by plaintiff M.J. Farms in November 2012 and Exxon filed its response (which contained the footnote referencing Exxon's "contractual indemnification rights") in February 2013. The trial court granted the Wagners' summary judgment motion in March 2013.

  When this judgment was signed, the proceedings in the underlying action were ongoing. The parties proceeded to trial on April 7, 2016, and trial lasted nine days. The Wagners first raised their res judicata defense in a supplement to their fifth amended answer filed on April 22, 2016 — the last day of trial.

  As this timeline shows, the Wagners waited over three years after the signing of the operative judgment to assert their res judicata defense. During this

period, the parties and the judicial system expended considerable resources as the case was prepared for and proceeded through trial. Permitting res judicata to be asserted at this late stage would undercut the goals the doctrine is intended to advance, *i.e.*, the efficient resolution of lawsuits. *See* Restatement (Second) of Judgment § 26 cmt. a (1982); *see also, e.g.*, *John G. & Marie Stella Kennedy Mem'l Found. v. Dewhurst*, 90 S.W.3d 268, 288-89 (Tex. 2002) (stating that the doctrine of res judicata serves "the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation") (citing *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 (1979)).

Therefore, the Wagners waived the defense of res judicata. *See* Restatement (Second) of Judgments § 26(a)(1) (1982). We overrule the Wagners' second issue.

## C. Sufficiency of the Evidence

In their third issue, the Wagners argue that the evidence is insufficient to support the submission of and the jury's responses to Questions Nos. 2 and 3. Question No. 2 inquired about the reasonableness of the *M.J. Farms* settlement; its text is set out in Section I.A.1. above. Question No. 3, which inquired about the reasonableness of the *Agri-South* settlement, used the same operative language.

The Wagners' challenge on this point focuses on the testimony of Exxon's expert, McLaughlin, and raises three arguments: (1) McLaughlin's testimony is impermissible *ipse dixit*; (2) McLaughlin's testimony is unreliable because he did not compare the *M.J. Farms* and *Agri-South* settlements to similar settlement agreements; and (3) McLaughlin's opinion rests on a material fact that was contradicted by the undisputed evidence.

We examine these arguments in light of the evidentiary sufficiency

27

standards outlined above in Section I.A.1.a.

### 1. *Impermissible Ipse Dixit*

Focusing on the *M.J. Farms* settlement, the Wagners contend that McLaughlin's only real justification for the settlement amount was the "risk" of a large judgment. Asserting that "reasonableness cannot turn solely on the amount of the plaintiff's demand," the Wagners argue that McLaughlin's testimony on this point is impermissible *ipse dixit*.

"Although expert opinion testimony often provides valuable evidence in a case, 'it is the basis of the witness's opinions, and not the witness's qualifications or his bare opinions alone, that can settle an issue as a matter of law; a claim will not stand or fall on the mere *ipse dixit* of a credentialed witness.'" *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 232 (Tex. 2004) (quoting *Burrow v. Arce*, 997 S.W.2d 229, 235 (Tex. 1999)). Conclusory opinion testimony is not relevant evidence because it does not tend to make the existence of a material fact "more or less probable." *See* Tex. R. Evid. 401; *see also Coastal Transp. Co.*, 136 S.W.3d at 232. Accordingly, conclusory expert testimony cannot support a judgment. *Custom Transit, L.P. v. Flatrolled Steel, Inc.*, 375 S.W.3d 337, 345 (Tex. App.—Houston [14th Dist.] 2012, pet. denied).

We conclude that McLaughlin's testimony addressing the reasonableness of the *M.J. Farms* settlement is not impermissible *ipse dixit*. Rather, McLaughlin's testimony supplied an appropriate foundation for his opinion.

Testifying at trial, McLaughlin said he graduated law school in 1976 and is licensed to practice in Louisiana. According to McLaughlin, he currently specializes in mediation but previously has tried various lawsuits, including "defending oil and gas environmental claims." McLaughlin testified that he first

28

became involved with the Louisiana legacy lawsuits in the early-2000s, when he worked with plaintiff M.J. Farms' attorney, Mike Vernon. McLaughlin said he began mediating legacy lawsuits around 2004 and, since then, has mediated between 20-30 legacy cases.

Discussing his preparation to testify at trial, McLaughlin said he reviewed documents relevant to the *M.J. Farms* litigation, including the pleadings, depositions, expert reports, hearing transcripts, pre-trial transcripts, trial transcripts, and law review articles discussing Louisiana legacy litigation. Ultimately, McLaughlin concluded the *M.J. Farms* settlement was "made in good faith" and "reasonable and prudent." McLaughlin pointed to the following factors to support his conclusion, many of which were discussed in detail above in Section 1.A.1.b.:

- Pre-trial rulings that limited Exxon's defense, including Judge Boothe's ruling that Exxon was the property's mineral servitude owner.

- The size of the *M.J. Farms* trial relative to the location in which it was held. McLaughlin described it as "the trial of the century for Catahoula Parish."

- The composition of the jury, which "presented a significant risk" based on their connections to plaintiff M.J. Farms and plaintiff's counsel.

- The strength of plaintiff M.J. Farms' counsel, Mike Vernon. McLaughlin said he had known Vernon "for probably close to 30 years" and described him as "extremely effective."

- Evidence that the jury heard about Exxon, including that it is the world's largest company and that its 2007 profits were $40 billion.

- Plaintiff M.J. Farms' damage models, including Arabie's testimony that environmental remediation would cost over $3 billion.

- Evidence showing that Exxon "clearly had potential liability to M.J. Farms."

- Similar legacy cases that resulted in multi-million-dollar verdicts for

the plaintiffs.

Describing this as a "very volatile, explosive combination" of factors, McLaughlin opined that it was "remarkable" Exxon settled the case for $57.5 million.

Considered together, this testimony and evidence provide a demonstrable and reasoned basis supporting McLaughlin's opinion that the *M.J. Farms* settlement was reasonable. *See Coastal Transp. Co.*, 136 S.W.3d at 232; *see also, e.g.*, *Amerada Hess Corp.*, 30 S.W.3d at 12 (evidence was sufficient to support finding that settlement was reasonable when expert based his opinion on "facts from deposition testimony," including valuations from the plaintiff's medical and economic experts). We overrule the Wagners' contention that McLaughlin's testimony constitutes impermissible *ipse dixit*.

### 2. *Settlement Comparisons*

The Wagners frame this argument by asserting that "[t]here can be no better guide to settlement values than the amounts that willing plaintiffs and defendants actually negotiate in similar lawsuits." Pointing out that McLaughlin "did not compare the Exxon settlement to similar settlement agreements," the Wagners contend that McLaughlin's opinion therefore is "unreliable and no evidence to support the judgment."

But the cases cited by the Wagners do not support the application of this principle to the facts presented here. *See Elizondo v. Krist*, 415 S.W.3d 259, 262-63 (Tex. 2013) (in a legal malpractice case, the court concluded the plaintiff's damages expert was not limited to comparing cases that were actually tried and could rely on evidence of cases that settled); *McMahon v. Zimmerman*, 433 S.W.3d 680, 688-89 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (the court concluded the expert failed to connect his opinion regarding the expected judicial division of community debt to "actual divisions made in factually-similar divorces"; the expert

30

relied on four divorce cases but did not offer any proof that these cases "out of the thousands of divorce cases in Texas" were representative); *Sieber & Calicutt, Inc. v. La Gloria Oil & Gas Co.*, 66 S.W.3d 340, 348 (Tex. App.—Tyler 2001, pet. denied) (when "[d]etermining whether a settlement in a wrongful death case is reasonable", an attorney "must review and analyze, ***among other things***, . . . the settlement amounts received in similar cases") (emphasis added). These cases do not hold that an expert's failure to incorporate comparable settlements into his analysis renders his testimony legally insufficient.

Moreover, McLaughlin testified at trial about jury verdicts reached in other legacy cases, including $60 million in *Corbello*, $168 million in *Grefer*, $60 million in *Dore*, $42 million in *Marin*, and $54 million in *Savoie*. McLaughlin testified about these cases' similarities to the *M.J. Farms* litigation and, on cross-examination, he was questioned about the cases' differences. The Wagners do not cite any cases that warrant discounting this evidence in favor of evidence that addresses only settlements.

We overrule the Wagners' contention that McLaughlin's testimony is unreliable because it did not incorporate comparable settlements.

### 3. *Contradicted Material Fact*

In their final challenge to McLaughlin's testimony, the Wagners assert that his opinion "rests on a material fact that was contradicted by the undisputed evidence." Specifically, the Wagners point out that McLaughlin's testimony was "based on the assumption that Exxon could be held responsible, as the mineral servitude owner" but, in subsequent litigation, the Wagners secured a judgment that the Wagners — not Exxon — owned the mineral servitude at issue.

This judgment was rendered in 2018, in a Louisiana lawsuit separate from

31

the *M.J. Farms* litigation or the suit involving plaintiff M.J. Farms' severed claims against the Wagners. This 2018 judgment grants a motion for partial summary judgment filed by the Wagners and, in relevant part, states:

> It is hereby ordered, adjudged and decreed that as a matter of law, Exxon Corporation, now Defendant, Exxon Mobil Corporation, as Assignor, conveyed all of its interest in any mineral servitude, oil and gas leasehold estates and/or other interests burdening the Plaintiffs' lands . . . unto Defendants, Bryan C. Wagner, Duer Wagner, III, Trade Exploration Corp. and James D. Finley, as Assignees[.]

However, this judgment was rendered after the *M.J. Farms* litigation and after McLaughlin's testimony in the underlying proceeding. The Wagners do not cite any authority to support their contention that a ruling on an issue obtained in subsequent, separate litigation can be used to discount testimony in an earlier suit. Therefore, this argument does not show that McLaughlin's testimony impermissibly rested on a contradicted material fact.

We overrule the arguments raised in the Wagners' third issue and conclude that sufficient evidence supports the submission of and the jury's findings in response to Questions Nos. 2 and 3.

## D.   Mandamus Proceeding

In their fourth issue, the Wagners ask us to revisit our prior decision conditionally granting Exxon's petition for writ of mandamus. *See In re Exxon Mobil Corp.*, 389 S.W.3d at 577.

In *In re Exxon Mobil Corp.*, we examined whether Exxon waived its attorney-client privilege under the offensive-use doctrine with respect to certain documents pertaining to Exxon's defense and settlement in the *M.J. Farms* litigation. *Id.* at 580. The offensive-use doctrine prohibits a plaintiff from maintaining evidentiary privileges that protect from discovery outcome-

32

determinative information not otherwise available to a defendant. *See id.* We outlined three factors relevant to this determination: (1) the party asserting the privilege must be seeking affirmative relief; (2) the privileged information is such that, if it is believed by the fact finder, in all probability it would be outcome determinative of the cause of action asserted; and (3) the disclosure of the confidential communication is the only means by which the aggrieved party may obtain the evidence. *Id.*

Concluding that this showing was not made, we held that (1) the relevant inquiry — *i.e.*, whether the settlement was reasonable, prudent, and in good faith — was objective rather than subjective, so as to put attorney-client communications beyond the offensive-use doctrine's reach, and (2) under this objective standard, the Wagners could obtain evidence from sources other than the privileged materials they were seeking. *Id.* at 580-83.

The Wagners do not raise any arguments on appeal addressing these determinations. Rather, the Wagners assert that we should revisit this decision because (1) allowing Exxon to withhold these materials limited the Wagners' ability to cross-examine Exxon's witnesses; and (2) the decision permitted Exxon to "craft a trial strategy that effectively invoked the 'advice of counsel' rationale without the concomitant waiver of privilege."

We decline the Wagners' invitation to revisit *In re Exxon Mobil Corp.* Under the law of the case doctrine, a decision rendered in a former appeal generally is binding in a later appeal of the same case. *Paradigm Oil, Inc. v. Retamco Operating, Inc.*, 372 S.W.3d 177, 182 (Tex. 2012); *Hoagland v. Butcher*, 474 S.W.3d 802, 809 (Tex. App.—Houston [14th Dist.] 2014, no pet.). The doctrine's purpose is to streamline litigation by winnowing the issues in each successive appeal, thus promoting efficiency and uniformity in the decision-

33

making process. *Paradigm Oil, Inc.*, 372 S.W.3d at 182.

The law of the case doctrine applies only to questions of law and does not necessarily apply when either the issues or the facts presented at successive appeals are not substantially the same as those involved in the first appeal. *Hoagland*, 474 S.W.3d at 809. But ultimately, the decision to revisit a previous holding is left to the discretion of the court under the particular circumstances of each case. *Id.*; *see Tex. Law Shield, LLP v. Crowley*, No. 14-18-00986-CV, 2020 WL 4873250, at *3 (Tex. App.—Houston [14th Dist.] Aug. 20, 2020, pet. denied) (mem. op.).

As discussed above, our decision in *In re Exxon Mobil Corp.* held that the relevant inquiry was objective and, accordingly, Exxon's privileged information relating to the *M.J. Farms* litigation was not necessary to the Wagners' defense. 389 S.W.3d at 582-83. The Wagners do not raise any arguments addressing the substance of these determinations. Likewise, the Wagners do not point to any changed facts or issues relevant to these determinations that would warrant their reconsideration.

Rather, the Wagners' arguments allege that the *In re Exxon Mobil Corp.* decision operated as a "strait-jacket" that Exxon "[e]xploit[ed]" at trial. These arguments do not address the reasoning underlying *In re Exxon Mobil Corp.* Therefore, we conclude that the law of the case doctrine precludes reconsideration of the issues resolved in the mandamus proceeding. *See Paradigm Oil, Inc.*, 372 S.W.3d at 182; *Hoagland*, 474 S.W.3d at 809.

We overrule the Wagners' fourth issue.

### E. Prejudgment Interest

The trial court's final judgment includes prejudgment interest on the

$28,220,000.00 assessed as actual damages for Exxon's settlements in the *M.J. Farms* and *Agri-South* lawsuits. In their fifth issue, the Wagners assert that prejudgment interest should be tolled for the following time periods: (1) the period during which trial court proceedings were "stayed" to permit Exxon to seek mandamus regarding the trial court's decision to compel certain discovery (*see In re Exxon Mobil Corp.*, 389 S.W.3d at 578); and (2) for "the duration of Exxon's premature appeal" (*see Exxon Mobil Corp.*, 2020 WL 7214159, at *1).

In Texas, an award of prejudgment interest arises from two legal sources: (1) general principles of equity, and (2) an enabling statute. *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 528 (Tex. 1998). Statutory provisions for prejudgment interest apply only to cases involving claims for wrongful death, personal injury, property damage, and condemnation. *Trevino v. City of Pearland*, 531 S.W.3d 290, 297 (Tex. App.—Houston [14th Dist.] 2017, no pet.). Because Exxon's claims do not fall within an enabling statute, equitable principles govern the trial court's award of prejudgment interest. *See id.*

When no statute controls, the decision to award prejudgment interest falls within the trial court's discretion. *Id.* at 297-98. The trial court abuses its discretion when it fails to analyze or apply the law correctly. *Hand & Wrist Ctr. of Houston, P.A. v. Republic Servs., Inc.*, 401 S.W.3d 712, 717 (Tex. App.—Houston [14th Dist.] 2013, no pet.).

"Prejudgment interest is awarded to fully compensate the injured party, not to punish the defendant." *Brainard v. Trinity Universal Ins. Co.*, 216 S.W.3d 809, 812 (Tex. 2006). "It is compensation allowed by law as additional damages for the lost use of money due as damages during the lapse of time between the accrual of the claim and the date of judgment." *Id.*

We apply these principles to the Wagners' two tolling arguments.

35

## *1. The Mandamus Proceeding*

Referencing the parties' Rule 11 agreement, the Wagners assert it would be inequitable to permit Exxon to recoup interest for the period of time when trial court proceedings were stayed at Exxon's request while it sought mandamus review of the trial court's decision to compel production of privileged documents. In relevant part, this Rule 11 agreement states that the parties "agree to abate all pretrial deadlines until the mandamus is finally resolved, at which time [the parties] will submit an amended agreed docket control order[.]"

But the cases the Wagners cite do not support the conclusion that this Rule 11 agreement required tolling prejudgment interest. *See Johnson & Higgins of Tex., Inc.*, 962 S.W.2d at 531; *Ellis v. City of Dallas*, 111 S.W.3d 161, 167-68 (Tex. App.—Eastland 2003, no pet.).

In *Johnson & Higgins of Texas, Inc.*, the Supreme Court of Texas stated that "[t]he purpose of a standstill agreement is normally to maintain the status quo and temporarily suspend or stop all aspects of a suit. In most circumstances, this would operate to toll the accrual of prejudgment interest while the agreement is in effect." 962 S.W.2d at 531. But the court concluded that the agreement at issue did not toll prejudgment interest, reasoning that the agreement had a "narrow" application that "applie[d] only to limitations, laches, and other defenses" and "expressly reserved" the plaintiff's other rights. *Id.* at 531-32. Continuing on, the court stated:

> The [parties'] agreement was silent with regard to prejudgment interest. The parties easily could have included a provision that prejudgment interest would abate during the specified standstill time period. Absent such provision, this court cannot imply one.

*Id.* at 531 n.12; *see also Ellis*, 111 S.W.3d at 167-68 (holding that the trial court did not abuse its discretion in tolling prejudgment interest for a period of time that certain claims were dismissed without prejudice pursuant to the parties'

36

agreement).

As in *Johnson & Higgins of Texas, Inc.*, the parties' Rule 11 agreement had a narrow application that applied only to "pretrial deadlines." The Rule 11 agreement is silent with respect to prejudgment interest and, absent such a provision, we will not imply one. *See Johnson & Higgins of Tex., Inc.*, 962 S.W.2d at 531 & n.12. Therefore, the parties' Rule 11 agreement does not show that the trial court's failure to toll prejudgment interest during the pendency of the mandamus proceeding constitutes an abuse of discretion.

### 2.    *The Premature Appeal*

The Wagners also contend that prejudgment interest should be tolled to exclude the time period during which Exxon's "premature appeal" was pending. *See Exxon Mobil Corp.*, 2020 WL 7214159, at *1-2 (dismissing Exxon's earlier appeal for lack of subject matter jurisdiction, this court concluded that the trial court's judgment was not final).

The Wagners do not cite any cases holding that a trial court abuses its discretion when it awards prejudgment interest for a period of time when an ultimately dismissed appeal was pending. Without such authority, we cannot conclude that the trial court's failure to toll prejudgment interest here constitutes an abuse of discretion. *See Trevino*, 531 S.W.3d at 297; *Hand & Wrist Ctr. of Houston, P.A.*, 401 S.W.3d at 717.

We overrule the Wagners' fifth issue.

## II.    Exxon's Issues

Raising two issues in its cross-appeal, Exxon contends: (1) the trial court erred by disregarding the jury's finding with respect to the *M.J. Farms* settlement; and (2) the Wagners forfeited the right to challenge the *M.J. Farms* settlement

amount.  Because we sustain Exxon's first issue, we need not reach its second.

As discussed above, in its verdict the jury found that the *M.J. Farms* settlement was "made in good faith and reasonable and prudent under the circumstances."  Exxon sought judgment on the verdict and asked the trial court to award it the full amount paid for the *M.J. Farms* settlement:  $57.5 million.  The trial court granted in part the Wagners' JNOV motion, disregarded the jury's finding regarding the *M.J. Farms* settlement, and determined that $14.11 million "should be considered applicable to the indemnified claims."   The trial court signed a final judgment on December 23, 2020, and awarded Exxon $14.11 million for the *M.J. Farms* settlement.

We review the propriety of a trial court's grant of JNOV under a legal sufficiency standard, which we outlined above in Section I.A.1.a.  But essentially, "[t]he final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review."  *Adam v. Marcos*, 620 S.W.3d 488, 499 (Tex. App.—Houston [14th Dist.] 2021, pet. denied).  We must affirm the directed verdict if the record establishes any ground that entitles the movant to judgment as a matter of law, even if it was not raised in the JNOV motion.  *Elloway v. Pate*, 238 S.W.3d 882, 889 (Tex. App.—Houston [14th Dist.] 2007, no pet.).

Here, legally sufficient evidence supports the jury's finding that the *M.J. Farms* settlement was "made in good faith and reasonable and prudent under the circumstances."  We set out the relevant evidence above in Section I.A.1.b.  This recitation details the factors relevant to the *M.J. Farms* litigation, including the parties and their counsel, pre-trial and trial proceedings, the evidence, expert testimony, damage models, settlement discussions, and the parties' final settlement agreement.  In sum, the jury repeatedly heard evidence that Exxon paid $57.5

million to settle the *M.J. Farms* litigation. Exxon provided evidence to support the amount it paid and, in response, the Wagners put on evidence to show that the amount paid for the settlement was not reasonable. Viewing this evidence in the light most favorable to the challenged finding, we conclude that it is sufficient to support the challenged finding. *See City of Keller*, 168 S.W.3d at 810; *Adam*, 620 S.W.3d at 499.

The Wagners did not raise any grounds in their JNOV motion that warrant disregarding the jury's finding with respect to the *M.J. Farms* settlement. Aside from challenging the sufficiency of the evidence, the Wagners also argued that the jury's finding should be disregarded because (1) Exxon failed to allocate the *M.J. Farms* settlement between indemnified and non-indemnified benefits; (2) res judicata bars Exxon from seeking recovery for the *M.J. Farms* settlement; and (3) Exxon damaged the Wagners' subrogation rights with respect to any claims they had against Tensas Delta.

Our analyses above reject the Wagners' arguments premised on allocation and res judicata. We briefly address the Wagners' contention regarding subrogation.

In the *M.J. Farms* final settlement agreement, Exxon purchased plaintiff M.J. Farms' claims against Tensas Delta and subsequently released those claims. In their JNOV motion, the Wagners argued that they would have been subrogated to these claims that Exxon released. Therefore, the Wagners argued, they "are excused from indemnifying Exxon for the *M.J. Farms* settlement."

But the cases the Wagners cited to support this contention analyze the issue in the context of insurance contracts that expressly provided for subrogation. *See Mendez v. Allstate Prop. & Cas. Ins. Co.*, 231 S.W.3d 581, 584-85 (Tex. App.— Dallas 2007, no pet.) (parties' arguments premised on provision in insurance

39

contract that addressed subrogation); *Found. Reserve Ins. Co. v. Cody*, 458 S.W.2d 214, 216 (Tex. Civ. App.—Dallas 1970, no writ) ("we conclude that the contract of insurance involved in this litigation, and upon which appellee must rely, specifically affords the right of subrogation"). Unlike these cases, the PSA and the Assignment do not contain any provisions addressing subrogation.

Aside from contractual subrogation, Texas courts also recognize the doctrine of equitable subrogation. *See Frymire Eng'g Co. ex rel. Liberty Mut. Ins. Co. v. Jomar Int'l, Ltd.*, 259 S.W.3d 140, 142 (Tex. 2008). "[E]quitable subrogation applies 'in every instance in which one person, not acting voluntarily, has paid a debt for which another was primarily liable and which in equity should have been paid by the latter.'" *Id.* (quoting *Mid-Continent Ins. Co. v. Liberty Mut. Ins. Co.*, 236 S.W.3d 765, 774 (Tex. 2007)). Thus, the party seeking equitable subrogation "must show it involuntarily paid a debt primarily owed by another in a situation that favors equitable relief." *Id.*

The Wagners do not identify any place in the record that makes this showing. Likewise, our review of the record does not reveal a situation warranting the application of equitable subrogation. Accordingly, this ground does not support the trial court's partial grant of the Wagners' JNOV motion.

Our review of the record does not establish any other grounds that would entitle the Wagners to judgment as a matter of law. *See Elloway*, 238 S.W.3d at 889. Therefore, we sustain Exxon's first issue and conclude the trial court erred by granting in part the Wagners' JNOV motion and awarding only $14.11 million for the *M.J. Farms* settlement. Because of this disposition, we need not reach Exxon's second issue.

## CONCLUSION

In their appeal, the Wagners raised five issues challenging (1) the viability of Exxon's indemnity claims and the evidence offered to support them; (2) this court's prior decision in a pretrial mandamus proceeding; and (3) the prejudgment interest awarded in the trial court's final judgment. For the reasons above, we overrule these issues.

Exxon raised two issues in its cross-appeal challenging the trial court's partial grant of the Wagners' JNOV motion. We conclude that legally sufficient evidence supports the jury's finding with regard to the *M.J. Farms* settlement and, accordingly, the trial court erred when it awarded Exxon only $14.11 million for this settlement. We reverse the trial court's judgment, reinstate the jury's verdict, and render the following judgment in accordance with that verdict:

> Exxon is entitled to recover from Bryan C. Wagner and Duer Wagner III, jointly and severally, the following amounts:
>
> 1. Actual damages in the amount of $71,611,869.52.
> 2. Prejudgment interest through December 22, 2020 in the amount of $20,765,405.00.
> 3. Court costs incurred by Exxon.
> 4. Post-judgment interest on the preceding amounts at the rate of five percent (5%), compounded annually, from December 23, 2020 until all amounts are paid in full.

/s/ Meagan Hassan
   Justice

Panel consists of Chief Justice Christopher and Justices Jewell and Hassan.

41